UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
KAYENAT FARAH, JOSEPH CAMMARATA,
CHARLOTTE ARMSTRONG and VIOLET
SIMPSON, on behalf of themselves and all others
similarly situated,

           Plaintiffs,                          FIRST AMENDED
                                                COMPLAINT

           -against-                      Docket No.  21-CV-5786 (VSB)

EMIRATES and EMIRATES SEVERANCE PLAN,
                                          Jury Trial Demanded
           Defendants.
--------------------------------------------------------X

## COMPLAINT

Plaintiffs Kayenat Farah, Joseph Cammarata, Charlotte Armstrong, and Violet Simpson (hereinafter referred to collectively as "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Risman & Risman, P.C., Brustein Law PLLC, and Renaker Hasselman Scott LLP, as and for their First Amended Complaint (hereinafter referred to as "Complaint") in this action against Defendants Emirates and the Emirates Severance Plan (hereinafter referred to as "Defendants"), respectfully allege as follows:

### NATURE OF THE ACTION

1.      This action is brought against Defendants to remedy violations of the Employee Retirement Income Security Act,  29 U.S.C. §§ 1001, et seq. ("ERISA"), the New York State Worker Adjustment and Retraining Notification ("NY WARN") Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") for

employment discrimination based on national origin and to redress employment practices of Emirates in violation of these statutes.

2.      This case is further brought to remedy the discrimination by Emirates against its American and/or U.S. national and/or perceived American employees ("American workers") in denying them the same benefits provided to its foreign non-American employees working in the United States.

3.      While Emirates had a severance (or "redundancy") policy (hereinafter "Severance Plan" or "Plan"), which required Emirates to pay its employees severance benefits upon termination of employment, Emirates has refused to pay benefits under the Severance Plan to its American workers. While Emirates has honored the Severance Plan for its non-American workers, Emirates has refused to pay its American workers what they are rightfully owed under the Plan.

4.      Furthermore, Emirates has intentionally and willfully kept the existence of the Plan a secret from most Emirates employees. In violation of ERISA, Emirates failed to inform Plaintiffs and similarly situated employees about their rights under the Severance Plan, and it failed to create or provide its employees with a Summary Plan Description ("SPD"), as required under ERISA.

5.      Further, Emirates failed to provide Plaintiffs as well as other employees terminated in New York State, with 90 days' advance written notice of their terminations, as required under the NY WARN Act when there is a plant closing or mass layoff.  In fact, Plaintiffs and others similarly situated did not receive any notice prior to their termination dates.

6.      In addition, Emirates discriminated against Plaintiffs and others similarly situated on the basis of their national origin. Plaintiffs are American workers and are thus members of a class protected under Title VII and the NYSHRL against discrimination based on national origin. In addition, Emirates discriminated against Plaintiffs Kayenat Farah, Charlotte Armstrong and

Violet Simpson, who were employed by Emirates in New York City at the time they were terminated, on the basis of their national origin in violation of the NYCHRL.

7.     Emirates discriminated against Plaintiffs and others similarly situated because they are American workers, in violation of the laws discussed above, in that their national origin and/or their perceived national origin was a factor in Emirates' decision to terminate their employment and to deny them benefits, including benefits under the Severance Plan. In addition, Emirates discriminated against Plaintiffs and others similarly situated by paying them less than non-American workers working in the United States and by failing and refusing to take reasonable and adequate steps to prevent and correct its discriminatory practices against American workers.

8.     Emirates' discriminatory and unlawful practices have been intentional, deliberate, willful and systematic, and were conducted in callous disregard of the rights of the Plaintiffs and others similarly situated.

9.     By reason of Defendants' unlawful and discriminatory conduct, Plaintiffs and others similarly situated have been denied benefits owed to them under the Severance Plan and under the New York Warn Act;  they have been denied promised travel benefits; and they have suffered monetary damages, embarrassment, emotional distress, humiliation, indignity and other resulting injury and loss.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(1)(B) and 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). This Court has subject matter jurisdiction over Plaintiffs' ERISA claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

11.     This Court has subject matter jurisdiction over the Title VII claims pursuant to 28

U.S.C. §§ 1331 and 1343, because the claims arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

12.    In addition, this Court has supplemental jurisdiction over the NYSHRL and the NYCHRL claims under 28 U.S.C. § 1367, because these claims arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as part of the same case or controversy under Article III of the United States Constitution.

13.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because Emirates resides or may be found in this district and because the Plan is administered in this district. Venue is also proper in this district under 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

14.    Venue also is proper in this district under 28 U.S.C. § 1391(b)(1) because Emirates resides within the Southern District of New York within the meaning of 28 U.S.C. § 1391(c); and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

15.    Venue is also proper in this judicial district under 28 U.S.C. § I 39l(b)-(c) and 42 U.S.C. § 2000e-5(t)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here and employment records relevant to that practice are maintained and administered here.

**JURY TRIAL DEMAND**

16.      For all claims other than the ERISA claims, Plaintiffs demand a trial by jury in this action.

**PARTIES**

17.      Plaintiff Kayenat Farah (hereinafter "Ms. Farah" or "Plaintiff Farah") is an American worker and a resident of the State of New York, who at all times material to this action has resided in Queens County, New York. She is a citizen of the United States. Ms. Farah was employed by Emirates for approximately seven (7) years. Ms. Farah was hired by Emirates on or about February 11, 2013, and she began working in one of Emirates' New York offices, located at 55 East 59th Street, New York, NY 10022, as a Human Resources Coordinator, a position that she held until Emirates terminated her employment on July 1, 2020. At all relevant times, Ms. Farah has been a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Severance Plan as a result of her employment with Emirates.

18.      Plaintiff Joseph Cammarata (hereinafter referred to as "Mr. Cammarata" or "Plaintiff Cammarata") is an American worker and a resident of the State of New York, who at all times material to this action has resided in Nassau County, New York. He is a Citizen of the United States. Mr. Cammarata was employed by Emirates for approximately twenty-five (25) years. Mr. Cammarata was hired by Emirates on or about July 9, 1995, and he began working in one of Emirates' New York offices, located at 405 Park Avenue, New York, New York as a Reservation Sales Agent. In December of 2003, Mr. Cammarata transferred to Nassau County, New York, where he worked, having attained the title of Senior Customer Sales and Service Agent, until Emirates terminated his employment on June 24, 2020. At all relevant times, Mr. Cammarata has

been a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Severance Plan as a result of his employment with Emirates.

19.    Plaintiff Charlotte Armstrong (hereinafter referred to as "Ms. Armstrong" or "Plaintiff Armstrong") is an American worker and a resident of the State of New York, who at all times material to this action has resided in Nassau County, New York. She is a citizen of the United States. Ms. Armstrong was employed by Emirates for approximately sixteen (16) years. Ms. Armstrong was hired by Emirates on or about March 31, 2004 and she began working in one of Emirates' New York offices, located at 55 East 59th Street, New York, New York 10022 as a Senior Accounts Assistant in the Finance and Accounting Department. She continued working in that office, having attained the title of Customer Affairs Officer, until Emirates terminated her employment July 1, 2020. At all relevant times, Ms. Armstrong has been a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Severance Plan as a result of her employment with Emirates.

20.    Plaintiff Violet Simpson (hereinafter referred to as "Ms. Simpson" or "Plaintiff Simpson") is an American worker and a resident of the State of New York, who at all times material to this action has resided in Bronx County, New York. She is a citizen of the United States. Ms. Simpson was employed by Emirates or approximately twenty-two (22) years. Ms. Simpson was hired by Emirates on or about September 15, 1998 and she began working in one of Emirates' New York offices, located at 405 Park Avenue, New York, New York 10022 as a Reservation Sales Agent. She continued working at one of Emirates' Manhattan offices, having attained the title of Customer Affairs Officer, until Emirates terminated her employment on July 1, 2020. At all relevant times, Ms. Simpson has been a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Severance Plan as a result of her employment with Emirates.

21.    On information and belief, Emirates is a foreign corporation under the laws of the State of New York, doing business in New York, with its principal place of business located at 55 East 59th Street, New York, New York 10022. On information and belief, Emirates is a foreign air carrier duly certificated by the United States Department of Transportation, engaged in the international carriage of passengers, baggage, and cargo, and maintains a place of business in New York.

22.    Emirates is registered and authorized to do business and to work in New York State as well as the States of Arizona, California, Florida, Georgia, Illinois, Massachusetts, New Jersey, Texas, and Washington State. On information and belief, Emirates maintains locations throughout the United States. Emirates transacts significant business in New York.

23.    On information and belief, as of April 2020, Emirates employed approximately 235 people throughout the United States, and approximately 60,000 worldwide.

24.    On information and belief, as of March 2020, Emirates employed approximately 130 people in the State of New York and approximately 85 people in New York City.

25.    Emirates is an "employer" within the meaning of Title VII, 42 U.S.C. §2000(e) and had fifteen (15) or more persons in its employ at all relevant times. Emirates is also an "employer" as defined in Section 292(5) of the New York State Executive Law and Section 8-107 of the New York City Human Rights Law, in that Emirates employs four (4) or more persons.

26.    The Severance Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1) because it is a "plan, fund, or program" that was established and is maintained by an employer for the purpose of providing for its participants benefits described in 29 U.S.C. § 186(c), specifically severance benefits. Pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d), the Plan may be sued under ERISA Title I as an entity.

27.    Emirates is the plan sponsor and Plan Administrator of the Severance Plan and thus is a fiduciary of the Plan under 29 U.S.C. § 1002(16)(B) who has authority to control and manage the administration of the Severance Plan. In addition, Emirates possesses or exercises authority, responsibility and/or control over the Severance Plan and thus is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

## ADMINISTRATIVE PREREQUISITES TO THE ACTION

28.    With respect to Plaintiffs' claim for benefits under Emirates' Severance Plan, each of the Plaintiffs has exhausted his or her administrative remedies pursuant to 29 C.F.R. § 2560.503-1. By letter dated October 19, 2020, counsel for Plaintiffs wrote to counsel for Emirates, asserting claims for benefits under the Severance Plan. By letter dated November 23, 2020, counsel for Emirates responded, asserting that no such plan exists. Accordingly, because the Severance Plan has failed to establish or follow claims procedures consistent with the requirements of 29 C.F.R. § 2560.503-1, Plaintiffs are deemed to have exhausted the administrative remedies available under the Plan.

29.    With respect to Plaintiffs' claims of discrimination and retaliation based on national origin, Plaintiffs filed timely charges of discrimination with the U.S. Equal Employment Opportunity Commission, New York Division.  Specifically, on March 25, 2021, Plaintiffs Farah, Cammarata, Armstrong and Simpson each filed with the EEOC a charge of national origin discrimination and retaliation, on behalf of themselves and all others similarly situated terminated by Emirates. The EEOC terminated its processing of these charges and issued a Notice of Right to Sue to each Plaintiff between April 15 and April 20, 2021.

30.    Contemporaneously with the filing of this Complaint, Plaintiffs have forwarded a copy of the Complaint to the New York City Commission of Human Rights and the Office of the

Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

31.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites with respect to their claims in this case.

## STATEMENT OF FACTS:

**Facts Relevant to the ERISA Claims**

32.     The Severance Plan is contained within Emirates' Employee Regulations Manual. At all relevant times, Emirates has used its Employee Relations Manual to govern its employee operations all over the world.

33.     The Employee Regulations Manual is broken into different sections specific to the different countries in which Emirates operates. Each such section is called a Pay and Allowances Manual. Thus, the Pay and Allowances Manual for the United States governs Emirates employees in the United States, and it contains policies pertaining to employee benefits, vacation and sick leave, and holidays, among other things. Attached as Exhibit A is the portion of the Pay and Allowances Manual for the United States that governs severance benefits.

34.     Emirates' Pay and Allowances Manual for employees in the United States contains a section called "Termination for Redundancy," referred to as the "Redundancy Policy," which constitutes the Severance Plan, and is attached hereto as Exhibit A.

35.     As of at least 2019, the Pay and Allowances Manual for the United States, which includes the Severance Plan, was more than 50 pages long and was kept in a two-ring binder in various locations, including in the Emirates' Human Resources office in New York.

36.     In addition, since in or around 2019, Emirates also has maintained a copy of the Pay and Allowances Manual for the United States in electronic format on its computer network.

37.     Emirates provided a copy of and/or access to the United States Pay and Allowances Manual, including the Severance Plan, to Emirates Airport Service Managers, Regional Finance Managers, Departmental Managers, and Human Resource employees. However, Emirates also instructed these employees to keep the information confidential, and to not provide information about the Plan to other employees.

38.     Likewise, Emirates never created or disseminated a Summary Plan Description or other information to participants in the Plan. Instead, Emirates took steps to keep the Plan hidden.

39.     Pursuant to the Severance Plan terms, all Emirates employees working in the United States, including employees in all pay grades, are potentially eligible for benefits under the Plan, and thus are participants in the Plan.

40.     Under the Plan's terms, an employee is eligible for benefits under the Plan if his or her employment is terminated by Emirates "involuntarily due to redundancy," which under the Plan means (a) a termination instituted by Emirates and the termination is not due to "just cause," and (b) but not if the business is purchased, amalgamated or reorganized and the employee is offered work in the purchased, amalgamated or reorganized business.

41.     The Severance Plan includes a chart specifying the benefits owed to employees in the United States who are terminated, calculated based on their length of service with Emirates. For an employee who had worked for Emirates for less than one year at the time of termination, the benefit owed is one week of regular pay. Employees who had worked for Emirates for at least a year are entitled to a benefit of two weeks' pay per year of service with Emirates, up to a maximum of 26 weeks. Emirates has referred to these benefits under the Severance Plan as "redundancy pay" (and herein also referred to as "severance pay").

42. Pursuant to the Severance Plan, if an employee is entitled to severance pay, he or she is also entitled to "a 3 month extension of Company provided health insurance." The Plan specifies that "During the 3 month extension, the Company will continue to contribute 90% of the premium while the Employee will continue to contribute 10% of the premium."

43. The Severance Plan is administered by Emirates, and on information and belief, the benefits are funded by Emirates from its operating assets.

44. As part of its ongoing administration of the Severance Plan, Emirates has a procedure in place to evaluate and determine whether a terminated employee is entitled to benefits under the Severance Plan. This procedure requires a determination of whether the individual was terminated for "just cause," including interpretation and application of that Plan term, and a determination of whether the individual was terminated after a change in the business structure and an offer of employment under the changed business structure. This procedure also requires that each employee's termination of employment be further evaluated and approved by the Senior Vice President of Human Resources in Dubai ("SVP of HR") and the Senior Vice President of the business division in Dubai ("SVP Business").

45. Each of these procedures in administering the Plan requires Emirates' discretion in interpreting the Plan terms and applying them to the circumstances of the employee slated for termination in order to reach a decision on benefits entitlement. Likewise, the 3 months of 90% employer-paid health insurance premiums requires on-going administration.

46. In addition, Plan requires that the employee slated for termination be provided with an "applicable notice period for termination of employment" as set forth in "Section B4 of the Pay and Allowances Manual." Exhibit A. Furthermore, even after Emirates has determined that the individual is entitled to benefits under the Plan, it must continue to evaluate the employee's

behavior and performance, and if Emirates determines that it is appropriate to terminate the individual for just cause during the "redundancy notice period," he or she will no longer be entitled to benefits under the Plan. This requires additional on-going administration of the Plan even after the initial determination of benefit eligibility.

47.    To gain approval for an employee's termination, including whether or not severance and 3-months of extended health insurance with employer-paid premiums would be provided, a representative from the human resources department would submit a termination proposal to the SVP of HR and SVP Business. The termination proposal would include an explanation of whether the termination was for "redundancy," or instead whether (a) the termination was due to "just cause" or (b) the termination was due to the business being purchased, amalgamated or re-organized and if so, whether the employee was offered work thereafter. In addition, if the termination was not for just cause or change in the business, the termination proposal was to include a calculation of benefits owed to the employee under the Severance Plan.

48.    In approximately 2016, the head of Emirates' Human Resources Department for the Americas, Ms. Wasan Alhusseiny, asked Ms. Farah to help prepare termination proposals for several employees working in the United States as part of a proposed restructuring.

49.    Consistent with her training by Emirates and Emirates' policies and procedures, for each proposed termination, Ms. Farah indicated that Emirates was initiating the termination and that it was for redundancy (*i.e.*, not for just cause or a change in the business), and then she copied the chart in the Severance Plan and provided it to Ms. Alhusseiny to calculate the required severance benefits owed to the employee.

50.    Upon information and belief, in approximately 2016, the SVP of HR and SVP Business approved all of these proposed terminations, and several United States employees were

terminated and paid the benefits owed to them under the Severance Plan, including both redundancy pay and the three months of extended health insurance with employer premium contributions.

51.    Some of the employees who were terminated in 2016 informed their former colleagues about the benefits they received under the Severance Plan, including informing Plaintiffs Cammarata, Armstrong, and Simpson.

52.    On multiple occasions, Wasan Alhusseiny and Jennifer Jackson complained that their efforts to terminate an employee of either the Call Center or the 55 East 59th Street location had been rejected by "Dubai" because Emirates did not want to pay the required lump sum payment for severance that the employee would be due at the time of redundancy.

53.    In 2020, Emirates involuntarily terminated the Plaintiffs as well as those similarly situated. Emirates claimed that the terminations were due to the business impact of the COVID-19 pandemic, not due to any "just cause" or business change.

54.    Plaintiff Cammarata, and those similarly situated slated for termination on June 24, 2020, from the Call Center were given a letter and/or email titled "Employment Status." This letter states in pertinent part that "It is with deep regret that we write to notify you that Emirates will permanently close its Garden City Call Center. . . resulting [in] impacting you and your fine co-workers . . . this has been a very hard decision: one we do not take lightly."

55.    Along with this letter, Emirates provided Plaintiff Cammarata and those similarly situated with a Frequently Asked Questions sheet ("FAQ Sheet"). The FAQ Sheet asked, "If I am made redundant is it permanent?" and answered, "Yes."

56.    The FAQ Sheet further asked, "Can I appeal this redundancy decision?" and answered, "No."

57.    The FAQ Sheet asked, "Can I opt for unpaid leave instead of redundancy?" and answered, "No."

58.    Plaintiffs, Farah Simpson and Armstrong, and those similarly situated who were slated for termination on July 1, 2020, were given a letter and/or email titled "Notice of Layoff." The Notice of Layoff stated in pertinent part that "You, along with several of your fine co-workers, have been selected for layoff.  The difficult decision was made only after careful consideration and evaluation of our options.  We anticipate the reduction in staffing will be permanent."

59.    Along with the Notice of Layoff, Emirates provided Plaintiffs and the others similarly situated with a Frequently Asked Questions sheet ("FAQ Sheet"). The FAQ Sheet asked, "Why have I been made redundant?" and answered, "With the significant changes to our operations, we have had to make some difficult decisions to ensure that we have the correct resource requirements in each area of our businesses. This means that we will be reducing the number of employees throughout our operation. As a result, you have been impacted by these changes."

60.    The FAQ Sheet further asked, "Can I appeal this redundancy decision?" and answered, "No."

61.    The FAQ Sheet asked, "Can I opt for unpaid leave instead of redundancy?" and answered, "No."

62.    In 2020, Essa Sulaiman Ahmad, Divisional Vice President of USA and Canada, admitted to at least one former American worker that the decision to terminate him was due to "the current restructuring of the commercial operations in the US."  Despite this constituting a company reorganization and despite Emirates not offering him a position in the newly reorganized company, Emirates denied him severance benefits.

63.     On June 26, 2020, Plaintiff Cammarata and the other Call Center employees received an email from Jennifer Jackson, the Human Resources Business Partner, which stated that "there is no severance payment with this redundancy."

64.     Although admitting this was a "redundancy" that would provide for severance payment, Emirates did not pay benefits under Severance Plan, including redundancy pay and the three-month extension of health insurance and 90% coverage of premiums to any of the Plaintiffs or similarly situated employees terminated in 2020.

65.     After Emirates terminated Plaintiffs' employment, through counsel, each submitted a claim for benefits under the Severance Plan. Emirates denied the claims.

66.     Emirates' claim denials did not describe any review procedures available under the Severance Plan.

67.     By letter to Emirates' counsel dated October 19, 2020, Plaintiffs' counsel requested, pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), that the Plan Administrator provide copies of the governing plan instrument(s) for the Severance Plan, the latest summary plan description for the Plan, and any summaries of material modifications to the summary plan description.

68.     To date, Plaintiffs have received no documents in response to this request.

**Additional Facts Relevant to the NY WARN Act Claim**

69.     The United States Center for Disease Control confirmed the first case of Covid-19 in the United States on January 21, 2020.

70.     On January 23, 2020, China placed Wuhan and its population of 11 million people under quarantine.

71.     On January 31, 2020, the World Health Organization declared Covid-19 a public health emergency.

72.     On February 2, 2020, global air travel began to be restricted by the United States and other countries.

73.     On March 13, 2020, the United States instituted a travel ban on travelers from 26 European countries.

74.     By June 15, 2020, Emirates had resumed passenger flights from New York.

75.     According to Emirates.com, in July 2020, Dubai had safely resumed its tourism activity.

76.     By August 2020, Emirates had also resumed passenger flights from Boston, Chicago, Houston, Los Angeles, and Washington D.C.

77.     On or about April 2020, Emirates notified Ms. Farah, Mr. Cammarata, Ms. Armstrong and Ms. Simpson and their similarly situated employees that they would be placed on unpaid furlough.

78.     The furlough notice cover letter stated that "in the current circumstances, we need to make immediate cost savings in order to protect the business and jobs of our staff."

79.     The furlough notice cover letter further stated that "we have decided in order to protect jobs and ensure we are ready and able to recover quickly when these restrictions are lifted, to ask a number of our staff, including you, to take a period of 'furlough.'"

80.     The furlough notice cover letter also represented that Emirates "will keep the situation constantly under review and will notify you of any changes to your Furlough."

81.     The furlough notice cover letter was signed by Divisional Vice President, USA and Canada, Essa Sulaiman Ahmad.

82.   The furlough notice stated that "we expect to continue this furlough through the period of travel restrictions and potentially for some time thereafter while our business begins to recover."

83.   The furlough notice stated that "we anticipate that the furlough may last several months, and could last up to six months."

84.   The furlough notice included an FAQ sheet that stated that "the lack of work combined with the additional governmental support provided in the CARES Act contributed to the decision [by Emirates] in the United States to temporarily furlough its staff."

85.   While Plaintiffs and the others similarly situated were on furlough, Emirates was not paying their salaries.

86.   The cost of keeping the Plaintiffs and the others similarly situated on unpaid furlough had a negligible impact on the overall budget for Emirates.

87.   On or about June 24, 2020, Emirates notified Mr. Cammarata and the others similarly situated that it was terminating their employment, that their positions were redundant and that they were no longer needed.

88.   On or about July 1, 2020, Emirates notified Ms. Farah, Ms. Armstrong and Ms. Simpson that it was terminating their employment, that their positions were redundant and that they were no longer needed.

89.   Both the Emirates Call Center located in Garden City, New York ("Call Center") and the Emirates office located at 55 East 59th Street in New York, New York ("55 East 59th Street") were used by Emirates for the same purpose, and shared the same staff and/or equipment. The 55 East 59th Street location supported the operations of the Call Center. Employees at both

locations were involved in the sale of tickets, customer service, and revenue optimization for Emirates, and sales agents at 55 East 59th Street were trained at the Call Center.

90.    Human Resources and other management and oversight for the Call Center was handled out of the 55 East 59th Street location, and managers for both locations regularly traveled between the two locations and worked together.

91.    In New York, the Call Center and 55 East 59th Street have a unity of personnel policies, a dependency of operations, the 55 East 59th Street office provides administrative services and support to the Call Center and both locations maintained an interconnected email plan, and both subjected their employees to the same terms and conditions of employment, including employee benefits.

92.    Many of the employees who worked at 55 East 59th Street, had been trained and worked at the Call Center.

93.    The manager of the Call Center reported to a vice president who worked at the 55 East 59th Street office.

94.    The manager of the Call Center attended regular meetings at the 55 East 59th Street office.

95.    Issues that arose on a day to day basis at the Call Center that could not be resolved by the manager were handled by the 55 East 59 Street office.

96.    Calls for the 55 East 59th Street office were often received and routed through the Call Center.

97.    The 55 East 59th Street office assisted the Call Center with handling reservations for group bookings.

98.     On or about June 24, 2020, Emirates notified Mr. Cammarata that it was terminating his employment, and that Emirates was no longer in need of his services.

99.     Except for the manager of the Call Center, Emirates terminated all of the other employees working at the Call Center at or around the same time, including Plaintiff Cammarata. Prior to that, Emirates employed approximately 43 employees at the Call Center.

100.    Upon information and belief, Emirates operated call centers in New York, United States, Mumbai, India, Dubai, United Arab Emirates, Budapest, Hungary, Manchester, United Kingdom, and Guangzho, China.

101.    Upon information and belief, the only Emirates' call center which was permanently closed was the one staffed by American workers – the Call Center in New York.

102.    In its June 24, 2020 notice of termination letter, Emirates stated that "we apologize that we were unable to provide to you more advance notice of this [termination], but we were unable to do so."

103.    In the June 24, 2020 notice of termination letter, Emirates blamed the terminations on "the sustained nature of governmental travel restrictions."

104.    While Emirates claimed that it was unforeseeable that the travel restrictions would last at least until June 24, 2020, Emirates had warned its employees two months earlier that the restrictions and furlough could last up to "six months."

105.    Even though Emirates blamed the terminations on "governmental travel restrictions," Emirates had already resumed passenger flights to the United States and other countries.

106.    In the June 24, 2020 notice of termination letter, Emirates admitted that it had reevaluated staffing and business needs prior to providing any notice of termination.

107.     In the July 1, 2020 notice of termination letter, Emirates stated that the decision to terminate Plaintiffs Farah, Simpson and Armstrong, and others similarly situated "was made only after careful consideration and evaluation of our options."

108.     Even though Emirates had terminated dozens of American workers the week before, Emirates gave no justification for not providing notice prior to July 1, 2020 of its decision to terminate Plaintiffs Farah, Armstrong, and Simpson, as well as any of the others similarly situated American workers terminated on that day.

109.     The Plaintiffs and others similarly situated were not terminated due to or as a direct result of a natural disaster, and they were not terminated due to or as a direct result of an unforeseeable business circumstance.

110.     There was no unforeseeable business circumstance which prevented Emirates from giving the required 90 day notice under the NY Warn Act to the Plaintiffs and others similarly situated.

111.     Providing zero notice, Emirates certainly did not give as much notice as practicable.

112.     Emirates could have given 90 days of notice, and complied with the NY Warn Act, but chose not to give any notice, without any reasonable or legitimate explanation.

113.     Upon information and belief, Emirates knew of an impending layoff, but chose to provide no notice to Plaintiffs or others similarly situated.

114.     Emirates' decision not to provide any notice to Plaintiffs or others similarly situated was not because providing such notice was impossible or unforeseeable.  Instead, the required notice would have been feasible.

115.     Upon information and belief, approximately two months after first placing Plaintiffs and others similarly situated on furlough, although Emirates claimed in their furlough

letter that the furlough could last up to six months, Emirates terminated the employment of Plaintiffs and more than 40 similarly situated employees claiming that they had no idea that it would be terminating them until that very day.

116.    Prior to the 2020 terminations, Emirates employed approximately 60 employees at their 55 East 59th Street location. On or about July 1, 2020, Emirates terminated approximately 15 employees from the 55 East 59th Street location, including Plaintiffs Farah, Armstrong and Simpson. On or about October 2020, Emirates terminated another approximately 25 employees from this location.

117.    At no time prior to their actual terminations did Emirates provide notice to any of the Plaintiffs, or to any of their colleagues at the Call Center or the 55 East 59th Street locations, that a significant number of employee positions would be eliminated or that they would be terminated from their employment.

118.    Emirates has not paid any of the Plaintiffs or those similarly situated who were placed on furlough in April 2020 their salary, and none have provided any work for Emirates, since April 2020. Thus, all of them who remained on furlough for more than six months were effectively terminated in April 2020.

119.    Even though Emirates had told the Plaintiffs and others similarly situated in April 2020 that the furlough could last up to six months, Emirates claimed approximately two months later that "the sustained nature of governmental travel restrictions due to COVID-19 was not foreseeable."

120.    None of the Plaintiffs or similarly situated employees received 90 days' advance written notice of their terminations, as required under the NY WARN Act.

121. No exception to NY WARN Act applies and Emirates was required to provide adequate notice to those employees who were terminated.

122. While Emirates claimed that it had to terminate the unpaid furlough workers without notice because of an unforeseeable business circumstance, Emirates nevertheless chose to spend millions of dollars sponsoring various professional sporting teams including soccer and cricket during that same time.

123. One example of their multi-million sponsorship is noted in Sportspromedia.com, announcing that on or about July 2020, Emirates signed a sponsorship deal with AC Milan, a professional soccer club in Milan, Italy, agreeing to pay the players approximately $10.8 million per year plus bonuses.

124. Upon information and belief, in August 2020, Emirates began posting job announcements for positions in New York for the same or similar jobs to those of the Plaintiffs and others similarly situated who had been terminated by Emirates.

125. Even though Emirates had just furloughed and terminated dozens of dedicated and qualified American workers, Emirates did not give priority to any of them.

126. Rather than bring back any of the furloughed or terminated American workers, Emirates made them all reapply and compete with new candidates for essentially their old jobs.

127. By October 2020, Divisional Vice President Essa Sulaiman Ahmad admitted to at least one former American worker that the decision to terminate and not rehire him was due to "the current restructuring of the commercial operations in the US," without any reference to Covid-19.

128. No financial hardship exception applies or absolves Emirates of their obligation to provide notice of termination under NY Warn Act.

129. On November 12, 2020, Sheikh Ahmed bin Saeed Al Maktoum, Chairman and Chief Executive of Emirates Airline and Group, said, "We have been able to tap on our own strong cash reserves, and through our shareholder and the broader financial community, we continue to ensure we have access to sufficient funding to sustain the business and see us through this challenging period."

130. During a May 2021 interview on Bloomberg TV, Sheikh Ahmed Bin Saeed Al Maktoum stated that Emirates maintained strong financial solvency despite the devastating impact of the pandemic on the global aviation sector.

131. In addition, no unforeseeable business exception applies or absolves Emirates of their obligation to provide notice of termination under NY WARN Act. By the time that Emirates terminated Plaintiffs and others similarly situated in New York, Emirates could not claim that the circumstances that led to the termination of their New York employees were not reasonably foreseeable.

**Additional Facts Relevant to the Discrimination Claims**

132. In approximately 2015, Emirates promoted Ms. Alhusseiny to the head of Emirates' Human Resources Department for the Americas. Ms. Alhusseiny is a United Arab Emirates national. On multiple occasions, Ms. Alhusseiny stated and let it be known that she preferred non-American workers over American workers in the Emirates workplace.

133. On or about June 24, 2020, Emirates closed its Call Center and terminated 42 employees who worked there. On information and belief, the Call Center was staffed by all or nearly all American workers. Prior to Emirates closing the Call Center, on multiple occasions Ms.

Alhusseiny stated that the Call Center should be closed because American workers complained too much and felt "entitled" with respect to their employment and employee benefits.

134.    On information and belief, since 2016, Emirates has been replacing American workers in upper management positions in the United States with United Arab Emirates nationals or other non-American workers.

135.    On information and belief, Emirates used the pandemic as an excuse to terminate as many American workers as possible. On or about April 2020, Ms. Alhusseiny said that the American workers were better off not being paid by Emirates and that the United States government would pay the Americans more than Emirates does during the pandemic.

136.    To further support this, Essa Ahmad, emailed the American workers and informed them that while Emirates would not be paying them, they should apply for benefits from the State and Federal government, through unemployment and pandemic assistance, as no assistance would be provided to them by Emirates.

137.    Upon information and belief, Ms. Alhusseiny used the pandemic to accomplish her long-stated goal of replacing American workers with non-American workers by, among other things, closing the Call Center and terminating the employment of American workers, including but not limited to terminating Ms. Farah, Mr. Cammarata, Ms. Armstrong, and Ms. Simpson, as well as other American workers, while maintaining the employment of United Arab Emirates nationals and other non-American workers employed by Emirates in the United States.

138.    Plaintiffs were each well qualified for their positions in which each had worked for a number of years. In addition, Emirates conducted job performance evaluations for each of them on a regular basis and their performance was regularly deemed to be satisfactory.

139. Even though Emirates provided severance benefits to United Arab Emirates nationals working in the United Arab Emirates, and to other non-American nationals working in other countries during the pandemic, and did not claim a financial inability to pay those employees, Emirates told the Plaintiffs and others similarly situated that it could not and would not provide them with severance pay or any continued health insurance with 90% employer-paid premiums for themselves or their dependents.

140. The foregoing constitutes an illegal pattern or practice of discrimination as well as conduct that has had an unjustified adverse impact upon American workers, both of which are prohibited by 42 U.S.C. §2000e, et seq.

141. Upon information and belief, Emirates did not terminate any United Arab Emirates nationals or other non-American workers working in the United States and refuse to provide them with severance pay or post-termination health insurance premiums during the pandemic.

142. There is no non-retaliatory or non-discriminatory reason for Emirates' termination of Plaintiffs and others similarly situated without providing them with severance pay and three months of health insurance premiums for themselves and their dependents.

143. In addition, on information and belief, Emirates has a different wage scale for American workers compared to United Arab Emirates nationals and other non-American workers recruited and/or brought in from overseas to work in the United States. Furthermore, on information and belief, Emirates provides other benefits including a housing stipend for United Arab Emirates nationals and other non-American workers recruited and/or brought in to work for Emirates in the United States from overseas, which are not provided to American workers, even if they are relocating within the United States.

144. While non-American terminated Emirates employees were provided with travel benefits for one year or more, Emirates limited these benefits for Plaintiffs and the other similarly situated American workers.

145. Emirates has distributed the wealth of its enormous success unequally-systematically favoring non-American workers. At nearly all levels of its management ranks, Emirates paid American workers less than similarly situated United Arab Emirate nationals and other non-American workers, although they performed the same or substantially similar work.

146. Emirates maintains policies and practices for hiring, promoting, and payment of salary to its employees that resulted in favoring Emirate nationals and non-American workers rather than American workers.

147. On information and belief, American workers have received less compensation and have been promoted less frequently than their Emirate and non-American counterpart as a result of the discriminatory policies, patterns, and/or practices of Emirates. These have not been isolated or exceptional incidents, but rather the regular and predictable result of Emirates' company-wide discriminatory policies and practices.

148. The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination against Plaintiffs and similarly situated individuals are: (1) paying them less than non-American workers working in the United States, (2) denying them severance and other benefits, (3) delaying and limiting their access to promised travel benefits, and (3) failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

**Additional Facts Relevant to the Retaliation Claims**

149. On or about October 19, 2020, Plaintiffs' counsel, on behalf of the Plaintiffs, notified Emirates' counsel that Emirates had discriminated against Plaintiffs based on their being American workers.

150. Emirates responded to the Plaintiffs, who had engaged in protected activity, in retaliation by restricting their ability to communicate with Emirates Human Resources Department even though no such restrictions had been placed on former Emirates employees who had not complained of discrimination. Emirates also restricted their post-termination travel benefits.

151. As a result, Plaintiffs suffered from difficulty obtaining post-termination information about their benefits, diminished travel benefits, and other financial losses, humiliation, disrespect, and emotional distress.

## CLASS ALLEGATIONS

**ERISA Claims (Causes of Action 1 through 3)**

152. All Plaintiffs bring the ERISA Claims (First through Third Causes of Action) on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (2).

153. The "ERISA Class" is defined as all former employees of Emirates whose employment was terminated by Emirates after January 1, 2020, for reasons other than (a) just cause or (b) business changes after which they were offered employment under the new business structure, and to whom Emirates failed to provide benefits under the Severance Plan.

154. Plaintiffs reserve the right to modify the definition of the ERISA Class based on information that they or class counsel learn through discovery.

155. The proposed ERISA Class meets all of the requirements of Federal Rule of Civil Procedure 23, as follows:

Numerosity:

156. On information and belief, the proposed ERISA Class is so numerous that joinder of all persons in the ERISA Class is impractical. Specifically, Plaintiffs are informed and believe, and based on thereon allege, that there are approximately 115 individuals, and possibly more, who are former employees of Emirates, and whose employment was terminated by Emirates since January 2020 for reasons other than just cause or business changes with an offer of employment under the new business structure, and to whom Emirates failed to provide benefits under the Severance Plan. Although the precise number of persons in the ERISA Class is not known at this time, the number and identity of the members of the ERISA Class are readily determinable based on Defendants' records.

Commonality:

157. There are common questions of law and fact affecting the rights of the members of the ERISA Class, including, without limitation:

a.    Whether the Severance Plan is governed by ERISA;

b.    Whether Emirates has failed to administer the Severance Plan in accordance with ERISA and the Severance Plan;

c.    Whether Emirates breached its fiduciary duties owed to Plan participants; and

d.    Whether Plaintiffs and the ERISA Class are entitled to declaratory, injunctive, and/or equitable relief for Defendants' violations of ERISA and the Severance Plan; and

<u>Typicality</u>:

158.    The ERISA claims of Plaintiffs Ms. Farah, Mr. Cammarata, Ms. Armstrong and Ms. Simpson – the Named Plaintiffs – are typical of the claims of the ERISA Class members because they arise from the same course of conduct, *i.e.* Defendants' failure to operate the Severance Plan in compliance with ERISA and its own terms. Plaintiffs and the members of the proposed ERISA Class sustained the same or similar injuries arising out of and caused by Defendants' common course of conduct in violation of ERISA and the terms of the Severance Plan. Plaintiffs' claims are thereby representative of, and co-extensive with, the claims of the proposed ERISA Class members.

<u>Adequacy</u>:

159.    The named representatives will fairly and adequately protect the interests of the proposed ERISA Class. There are no conflicts between the interests of the Plaintiffs and the other members of the proposed ERISA Class.

<u>Rule 23(b)(1) Requirements</u>:

160.    This action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Specifically, separate actions by individual class members could produce varying adjudications as to, inter alia, the Severance Plan's status as an ERISA plan, as well as the proper relief to remedy Defendants' ERISA violations.

Rule 23(b)(2) Requirements:

This action is maintainable as a class action under Rule 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the ERISA Class, thereby making appropriate injunctive and other equitable relief in favor of the ERISA Class. In particular, Defendants' failure to treat the Severance Plan as an ERISA plan and to abide by ERISA's disclosure and fiduciary requirements was systemic in nature, affecting all similarly situated Severance Plan participants whose employment was terminated by Emirates in the same way.

**NY WARN Act Claim (Cause of Action 4)**

161.    All Plaintiffs bring the NY WARN Act Claim (Fourth Cause of Action) on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

162.    The "NY WARN Act Class" is defined as all former employees of Emirates who worked for Emirates in the State of New York, and whose employment was terminated from Emirates as part of, or as the result of, the mass layoffs or plant closings carried out by Emirates between June 24, 2020 and July 1, 2020 as well as between October 1, 2020 and October 31, 2020.

163.    All Plaintiffs are members of the NY WARN Act Class and all Plaintiffs seek to act as representatives of the proposed NY WARN Act Class.

164.    Plaintiffs reserve the right to modify the definition of the NY WARN Act Class based on information that they or class counsel learn through discovery.

165.    The proposed NY WARN Act Class meets all of the requirements of Federal Rule of Civil Procedure 23, as follows:

Numerosity:

166.    The persons in the NY WARN Class are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Emirates. On information and belief, Emirates terminated at least 82 full-time employees, between June 24, 2020 and July 1, 2020 as well as between October 1, 2020 and October 31, 2020 from the Call Center and the 55 East 59th Street locations.

167.    On information and belief, the identity of all the members of the NY WARN Act Class and the recent residence address of each of the NY WARN Act Class members is contained in Emirates' books and records.

Commonality:

168.    There are common questions of law and fact affecting the rights of the members of the NY WARN Act Class, including, without limitation:

a.    Whether the members of the NY WARN Act Class were employees of Emirates who worked in a covered site of employment of Emirates;

b.    Whether Emirates unlawfully terminated the employment of the members of the NY WARN Act Class without cause on their part and without giving them 90 days advance written notice in violation of the NY WARN Act; and

c.    Whether Emirates unlawfully failed to pay the NY WARN Act Class members 60 days wages and benefits as required by the NY WARN Act.

Typicality:

169.    The NY Warn Act claims of Plaintiffs Farah, Cammarata, Armstrong and Simpson – the Named Plaintiffs – are typical of the claims of the NY WARN Act Class members because

they arise from the same course of conduct, *i.e.* Emirates' mass layoff and/or plant closure(s). Plaintiffs and the members of the proposed NY WARN Act Class sustained the same or similar injuries arising out of and caused by Emirates' common course of conduct in violation of NY WARN Act. Plaintiffs' claims are thereby representative of, and co-extensive with, the claims of the proposed NY WARN Act Class members.

Adequacy:

170.    The named representatives will fairly and adequately protect the interests of the proposed NY WARN Act Class. There are no conflicts between the interests of the Plaintiffs and the other members of the proposed NY WARN Act Class.

Rule 23(b)(3) Requirements:

171.    This action is maintainable as a class action under Rule 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the NY WARN Act Class, because a class action is superior to other available methods for the fair and efficient adjudication of this litigation, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual NY WARN Act Class members are small compared to the expense and burden of individual prosecution of this litigation.

172.    Concentrating all potential litigation concerning the NY WARN Act rights of the members of the NY WARN Act Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the NY WARN Act rights of all the members of the NY WARN Act Class.

**Discrimination Claims (Causes of Action 5 through 10)**

173.     Plaintiffs bring the discrimination claims (Fifth through Tenth Causes of Action) on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

174.     The "Discrimination Class" is defined as all American workers whose employment was terminated by Emirates and who were denied severance benefits and 3-months of extended health insurance including 90 percent employer-paid premiums and who were otherwise treated by Emirates less favorably than non-American workers.

175.     All Plaintiffs are members of the Discrimination Class, and all Plaintiffs seek to act as representatives of the Discrimination Class.

176.     The "NYS Discrimination Sub-Class" is defined as all members of the Discrimination Class who worked for Emirates in New York State ("NYS"). All Plaintiffs are members of the NYS Discrimination Sub-Class, and seek to act as representatives of this sub-class.

177.     The "NYC Discrimination Sub-Class" is defined as all members of the Discrimination Class who worked for Emirates in New York City ("NYC") when their employment was terminated. Plaintiffs Farah, Armstrong and Simpson are members of the NYC Discrimination Sub-Class, and seek to act as representatives of this sub-class.

178.     Plaintiffs reserve the right to modify the definitions of the Discrimination Class, the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class based on information that they or class counsel learn through discovery.

179.     The proposed Discrimination Class, NYS Discrimination Sub-Class, and NYC Discrimination Sub-Class meet all of the requirements of Federal Rule of Civil Procedure 23, as follows:

Numerosity:

180.    The members of the Discrimination Class as well as the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class are so numerous that joinder of all members is impracticable. Emirates terminated approximately 115 American workers between June 24, 2020 and July 1, 2020 as well as between October 1, 2020 and October 31, 2020, approximately 82 of whom were employees in New York State, and approximately 40 of whom were employees in New York City. These numbers are greater than can be feasibly addressed through joinder.

Commonality:

181.    There are common questions of law and fact affecting the rights of the members of the Discrimination Class, the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class, including without limitation:

   a.    Whether Defendant Emirates unlawfully discriminated against Plaintiffs and those similarly situated through Emirates' common, uniform and discriminatory policies and practices;

   b.    Whether Emirates engaged in a pattern or practice of paying American workers less than non-American workers;

   c.    Whether Emirates engaged in a pattern or practice of denying severance benefits to American workers while providing severance benefits to non-American workers; and

   d.    Whether Emirates failed and refused to take reasonable and adequate steps to prevent and correct instances of discrimination.

182.    In addition, Emirates has computerized account data, payroll data, and personnel data that will make calculation of damages possible for the Class as whole.

Typicality:

183.    The discrimination claims of Plaintiffs Farah, Cammarata, Armstrong and Simpson – the Named Plaintiffs – are typical of the claims of the Discrimination Class members and of the claims of the NYS Discrimination Sub-Class and NYC Discrimination Sub-Class members because they arise from the same course of conduct, *i.e.* Emirates' unlawful treatment of American workers. Plaintiffs and the members of the proposed Discrimination Class, NYS Discrimination Sub-Class and NYC Discrimination Sub-Class sustained the same or similar injuries arising out of and caused by Emirates' common course of conduct in violation of anti-discrimination laws. Plaintiffs' claims are thereby representative of, and co-extensive with, the claims of the members of the proposed Discrimination Class, NYS Discrimination Sub-Class and NYC Discrimination Sub-Class.

Adequacy:

184.    The Named Plaintiffs will fairly and adequately protect the interests of the proposed Discrimination Class, NYS Discrimination Sub-Class and NYC Discrimination Sub-Class. There are no conflicts between the interests of the Plaintiffs and the other members of the proposed class and sub-classes.

Rule 23(b)(2) Requirements:

185.    The discrimination claims are maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Emirates has acted and/or refused to act on grounds generally applicable to the Discrimination Class, the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and those similarly situated. The members of the Discrimination Class, the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class are entitled to declaratory and

injunctive relief to end the common, uniform, unfair, and discriminatory policies and practices of Emirates.

Rule 23(b)(3) Requirements:

186.    This action is maintainable as a class action under Rule 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Discrimination Class, the NYS Discrimination Sub-Class and the NYC Discrimination Sub-Class and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Claim for Benefits Under the Severance Plan**
**(ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))**
**(On Behalf of All Plaintiffs and the ERISA Class Against All Defendants)**

187.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

188.    This Claim is brought by all Plaintiffs on behalf of themselves and the proposed ERISA Class against all Defendants.

189.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

190.    The Emirates Severance Plan constitutes an ERISA plan because it provides severance benefits pursuant to an ongoing administrative scheme.

191.    Plaintiffs and the ERISA Class members are entitled to benefits under the Plan, including both severance pay and a three month extension of company-provided health insurance with 90% of premiums covered by Emirates for themselves and their dependents. By denying their

benefits under the Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Plaintiffs' rights thereunder.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Claim for Breach of Fiduciary Duty Against Emirates**
**(ERISA 29 U.S.C. § 502(a)(3), 29 U.S.C. § 1132(a)(3))**
**(On Behalf of All Plaintiffs and the ERISA Class Against Defendant Emirates)**

192.   Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs as though set forth at length herein.

193.   This Claim is brought by all Plaintiffs on behalf of themselves and the proposed ERISA Class against Defendant Emirates.

194.   ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, inter alia, that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

195.   Plan participants and their beneficiaries may sue "(A) to enjoin any act or practice which violates any provision of [Title I of ERISA] of the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3).

196.   Emirates has breached its fiduciary duties by failing to operate their Severance Plan in compliance with ERISA's prudence and loyalty requirements, by attempting to keep the Severance Plan a secret from its employees, by failing to create and provide a Summary Plan Description to its employees, and by related acts and omissions.

197.    As a consequence of Emirates' breaches, Plaintiffs and the ERISA Class have been harmed, including in that they have not received information required by ERISA to be disclosed to them, and have not been notified of their eligibility for benefits, and have suffered resulting economic injuries.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Claim for Violation of 29 U.S.C. § 1024 Against Defendants**
**(ERISA 29 U.S.C. § 104, 29 U.S.C. § 1024)**
**(On Behalf of All Plaintiffs and the ERISA Class Against Defendant Emirates)**

198.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

199.    This Claim is brought by all Plaintiffs on behalf of themselves and the proposed ERISA Class against Defendant Emirates.

200.    ERISA Section 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), authorizes a plan participant to bring a civil action for the relief provided for in ERISA Section 502(c), 29 U.S.C. § 1132(c).

201.    ERISA Section 502(c)(1)(A), 29 U.S.C. § 1132(c)(1)(A), provides that any administrator who fails or refuses to comply with a request for any information which such administrator is required by ERISA Title I to furnish to a participant by mailing the requested material to the participant within 30 days after the request may in the court's discretion be personally liable to such participant in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper. For this purpose, each violation with respect to any single participant shall be treated as a separate violation.

202.    A Department of Labor regulation, 29 C.F.R. § 2575.502c-1, increases the penalty under ERISA Section 502(c) to $110 per day.

203.    Plaintiffs and the members of the ERISA Class have been harmed by this failure in that they were not made aware of their rights as participants in the ERISA-governed Severance Plan.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violation of New York State Worker Adjustment and Retraining Notification Act
### (New York Labor Law § 860 et seq.)
### (On Behalf of All Plaintiffs and the NY WARN Act Class Against Defendant Emirates)

204.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

205.    Plaintiffs bring this action on behalf of themselves and the proposed NY WARN Act Class against Defendant Emirates.

206.    Emirates was required by the NY WARN Act to give the Plaintiffs and NY WARN Act Class members at least 90 days advance written notice of their terminations pursuant to § 860-B of the NY WARN Act.

207.    Emirates terminated Plaintiffs along with approximately 82 similarly situated employees as part of, or as the foreseeable result of, mass layoffs or plant closings ordered by Emirates between June 24, 2020 and July 1, 2020 as well as between October 1, 2020 and October 31, 2020.

208.    On or about June 24, 2020, Emirates closed the Call Center and terminated approximately 42 employees working at that location, including Plaintiff Cammarata.

209.    On or about July 1, 2020 Emirates terminated approximately 15 employees working at the 55 East 59th Street location, including Plaintiffs Farah, Armstrong and Simpson.  Thereafter,

on or about October 2020, Emirates terminated approximately 25 additional employees working at the 55 East 59th Street location.

210.    Because none of these employees from either the Call Center or the 55 East 59th Street locations received pay or worked at all since April 2020, Emirates effectively terminated all 82 individuals as of April 2020, without any notice of termination.

211.    At all relevant times, Emirates was an individual or private business entity defined as "employer" under the NY WARN Act and continued to operate as a business until Emirates decided to order a mass layoff or plant closing at the Facilities as defined by § 860-A(3),(4).

212.    On or about June 24, 2020 through July 1, 2020, Emirates ordered mass layoffs and/or plant closings at its Facilities as defined by § 860-A(3),(4) of the NY WARN Act.

213.    On or about October 2020, Emirates ordered mass layoffs and/or plant closings at its Facilities as defined by § 860-A(3),(4) of the NY WARN Act.

214.    Emirates failed to give the requisite notice required by the applicable law.  The terminations failed to give Plaintiffs and others similarly situated at least 90 days' advance notice of termination, as required by the NY WARN Act.

215.    Plaintiffs and the NY WARN Act Class members suffered terminations of employment as defined by § 860-A(2)(C) of the NY WARN Act, having been terminated by Emirates without cause on their part.

216.    As a result of this violation, Plaintiffs and the NY WARN Act Class members seek the payment of statutory remedies by Emirates under the NY WARN Act in the form of 60 days wages and benefits.

217.    Emirates failed to pay the Plaintiffs and each of the NY WARN Act Class members their respective wages, salary, commissions, bonuses, and health insurance premiums for 60 days following their respective terminations.

218.    Based upon the foregoing facts, Plaintiffs the NY WARN Act Class members were injured by Emirates' failure to give notice of the intended terminations.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Intentional Discrimination**
**(Title VII, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Discrimination Class Against Defendant Emirates)**

219.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

220.    This Claim is brought by all Plaintiffs on behalf of themselves and the proposed Discrimination Class against Defendant Emirates. Plaintiffs have all timely filed class charges with the EEOC and have thus exhausted their administrative remedies.

221.    Emirates has engaged in an intentional discrimination against Plaintiffs and the Discrimination Class based on their national origin.

222.    The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination against Plaintiffs and members of the Discrimination Class include: (1) paying them less and providing them with less benefits than non-Americans working in the United States, (2) denying them severance and other benefits, and (3) failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

223.    Emirates' company-wide policies, patterns, and/or practices of determining compensation and eligibility for promotion based on national origin are in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such a system and/or

policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

224.    As a direct result of Emirates' discriminatory policies and/or practices as described above, Plaintiffs and the Discrimination Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

225.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

226.    The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination has occurred both within and outside the liability period in this case.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Disparate Impact Discrimination**
**(Title VII, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Discrimination Class Against Defendant Emirates)**

227.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

228.    This claim is brought by all Plaintiffs on behalf of themselves and the proposed Discrimination Class against Defendant Emirates. Plaintiffs have timely filed class charges with the EEOC and have thus exhausted their administrative remedies.

229.    Emirates' company-wide policies, patterns, and/or practices of determining compensation and eligibility for promotion based on national origin are in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such a system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

230.    As a direct result of Emirates' discriminatory policies and/or practices as described above, Plaintiffs and the Discrimination Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

231.    The foregoing policies, patterns, and/or practices have an unlawful disparate impact on American workers in violation of 42 U.S.C. §§ 2000e *et seq.*

232.    The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination has occurred both within and outside the liability period in this case.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Intentional Discrimination**
**(New York State Human Rights Law, New York Executive Law § 296)**
**(On Behalf of All Plaintiffs and the NYS Discrimination Sub-Class**
**Against Defendant Emirates)**

233.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

234.    This claim is brought by all Plaintiffs on behalf of themselves and the proposed NYS Discrimination Sub-Class against Defendant Emirates.

235.    Emirates has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its American workers and has intentionally discriminated against Plaintiffs and the NYS Discrimination Sub-Class in violation of the New York State Human Rights Law by, among other things: (1) paying them less and providing them with less benefits than non-Americans working in the United States, (2) denying them severance and other benefits, and (3) failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

236.    These company-wide policies are intended to and do have the effect of: (1) denying Plaintiffs and NYS Discrimination Sub-Class members business opportunities because of

their national origin or perceived national origin; (2) compensating them less because of their national origin or perceived national origin; (3) subjecting them to inferior terms, conditions, or privileges of employment; and (4) denying them severance and other benefits.

237.    The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination has occurred both within and outside the liability period in this case.

238.    Emirates has set and/or maintained these discriminatory policies, patterns,and/or practices during the liability period within the State of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American workers within the State of New York.

239.    As a direct result of Emirates' discriminatory policies and/or practices described above, Plaintiffs and the NYS Discrimination Sub-Class have suffered damages including, but not limited to lost past and future income, compensation, and benefits.

240.    Emirates has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the State of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American workers within the State of New York.

The foregoing conduct constitutes illegal, intentional discrimination prohibited by the NYSHRL, New York Executive Law § 296.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Disparate Impact Discrimination**
**(New York State Human Rights Law, New York Executive Law § 296)**
**(On Behalf of All Plaintiffs and the NYS Discrimination Sub-Class**
**Against Defendant Emirates)**

241.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

242.    This claim is brought by all Plaintiffs on behalf of themselves and the proposed NYS Discrimination Sub-Class.

243.    Emirates' company-wide policies, patterns, and/or practices of determining compensation, firing, and denying severance are in violation of the NYSHRL and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

244.    These company-wide policies are intended to and do have the effect of: (1) denying Plaintiffs and NYS Discrimination Sub-Class members business opportunities because of their national origin or perceived national origin; (2) compensating them less because of their national origin or perceived national origin (3) subjecting them to inferior terms, conditions, or privileges of employment; and (4) denying them severance benefits and other benefits.

245.    Emirates has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

246.    Emirates has set and/or maintained these discriminatory policies, patterns,and/or practices during the liability period within the State of New York and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American workers within the State of New York.

247.    As a direct result of Emirates' discriminatory policies and/or practices as described above, Plaintiffs and the NYS Discrimination Sub-Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

248.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by the NYSHRL, New York Executive Law § 296.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Intentional Discrimination**
**(NYCHRL, New York City Admin. Code§ 8-107 *et seq.*)**
**(On Behalf of Plaintiffs Farah, Armstrong, Simpson and the NYC Discrimination Sub-Class Against Defendant Emirates)**

249.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

250.    This claim is brought by Plaintiffs Farah, Armstrong and Simpson on behalf of themselves and the proposed NYC Discrimination Sub-Class against Defendant Emirates.

251.    Emirates has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its American workers and has intentionally discriminated against Plaintiffs Farah, Armstrong and Simpson and the NYC Discrimination Sub-Class in violation of the NYCHRL by, among other things by (1) paying them less and providing them with less benefits than non-Americans working in the United States, (2) denying them severance benefits, and (3) failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

252.    These company-wide policies are intended to and do have the effect of: (1) denying Plaintiffs Farah, Armstrong and Simpson and NYC Discrimination Sub-Class members business opportunities because of their national origin or perceived national origin; (2) compensating them less because of their national origin or perceived national origin (3) subjecting them to inferior terms, conditions, or privileges of employment, and (4) denying them severance benefits and other benefits.

253. The discriminatory acts that constitute Emirates' pattern and/or practice of discrimination has occurred both within and outside the liability period in this case.

254. Emirates has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American workers of Emirates within the City of New York.

255. As a direct result of Emirates' discriminatory policies and/or above. Plaintiffs Farah, Armstrong and Simpson and the NYC Discrimination Sub-Class have suffered damages including, but not limited to lost past and future income, compensation, and benefits.

256. Emirates has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American workers within the City of New York.

257. The foregoing conduct constitutes illegal, intentional discrimination prohibited by the NYCHRL, New York City Administrative Code § 8-107 *et seq.*

**AS AND FOR A TENTH CAUSE OF ACTION**
**Disparate Impact Discrimination**
**(NYCHRL, New York City Administrative Code§ 8-107 *et seq.*)**
**(On Behalf of Plaintiffs Farah, Armstrong, and Simpson, and the NYC**
**Discrimination Sub-Class Against Defendant Emirates)**

258. Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

259.    This claim is brought by Plaintiffs Farah, Armstrong and Simpson on behalf of themselves and the NYC Discrimination Sub-Class against Defendant Emirates.

260.    Emirates' company-wide policies, patterns, and/or practices of determining compensation, firing decisions, and denying severance to its American workers are in violation of the NYCHRL and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

261.    Emirates has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

262.    Emirates has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on American and/or perceived American workers of Emirates, within the City of New York.

263.    As a direct result of Emirates' discriminatory policies and/or practices as described above, Plaintiffs Farah, Armstrong and Simpson and the NYC Discrimination Sub-Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

264.    The foregoing conduct constitutes illegal discrimination prohibited by the NYCHRL, New York City Administrative Code § 8-107 *et seq.*

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Retaliation**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e** *et seq.)*
**(On Behalf of All Plaintiffs Individually Against Defendant**
**Emirates)**

265.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

266.    This claim is brought by Plaintiffs individually against Defendant Emirates.

267.    Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and have thus exhausted their administrative remedies.

268.    Plaintiffs engaged in protected activities, including but not limited to retaining counsel to object to being treated differently based upon their national origin or perceived national origin as Americans and objecting to discriminatory practices, discriminatory acts, policies and procedures.

269.    Emirates took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, including but not limited to: (1) denying them timely and continued access to their travel benefits; (2) denying them the ability to timely retrieve their personal possessions from Emirates offices; (3) limiting their access to Human Resources; and, (4) denying them other opportunities provided to Emirates workers who had not engaged in protected activity.

270.    Plaintiffs suffered damages as a result of that conduct.

**AS AND FOR A TWELFTH CAUSE OF ACTION RELIEF**
Retaliation
**(New York State Human Rights Law, New York Executive Law § 296 –**
**On Behalf of All Plaintiffs Individually Against Defendant Emirates)**

271.     Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

272.     This claim is brought by all Plaintiffs on behalf of themselves individually against Defendant Emirates.

273.     Plaintiffs engaged in protected activities, including but not limited to retaining counsel to object to being treated differently based on their national origin or perceived national origin as Americans and objecting to discriminatory practices, discriminatory acts, policies and procedures.

274.     Emirates took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, including but not limited to: (1) denying them timely access to their travel benefits; (2) denying them the ability to timely retrieve their personal possessions from Emirates offices; (3) limiting their access to Human Resources; and, (4) denying them other opportunities provided to Emirates workers who had not engaged in protected activity.

275.     Plaintiffs suffered damages as a result of that conduct.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION RELIEF**
**Retaliation**
**(NYCHRL, New York City Administrative Code§ 8-107 *et seq.*)**
**(On Behalf of Plaintiffs Farah, Armstrong, and Simpson**
**Individually Against Defendant Emirates)**

276.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as thought set forth as length herein.

277.    This claim is brought by Plaintiffs Farah, Armstrong, and Simpson, individually against Defendant Emirates.

278.    Plaintiffs engaged in protected activities, including but not limited to retaining counsel to object to being treated differently based on their national origin or perceived national origin as Americans and objecting to discriminatory practices, discriminatory acts, policies and practices.

279.    Emirates took adverse actions against Plaintiffs Farah, Armstrong, and Simpson with the purpose of retaliating against them because of their participation in protected activities, including but not limited to: (1) denying them timely access to their travel benefits; (2) denying them the ability to timely retrieve their personal possessions from Emirates offices; (3) limiting their access to Human Resources; and, (4) denying them other opportunities provided to Emirates workers who had not engaged in protected activity.

280.    Plaintiffs Farah, Armstrong, and Simpson suffered damages as a result of that conduct.

**ALLEGATIONS REGARDING RELIEF**

281.    Plaintiffs and the classes they seek to represent have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they

seek in this action is the only means of securing complete and adequate relief. Plaintiffs and the classes they seek to represent are now suffering, and will continue to suffer, irreparable injury from Defendants' conduct, discriminatory acts and omissions.

282.    Defendants' actions have caused and continue to cause Plaintiffs and all members of the classes and sub-classes they seek to represent substantial losses.

283.    In addition, Plaintiffs and the members of the classes and sub-classes they seek to represent suffer and continue to suffer emotional distress, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

284.    Emirates performed the acts herein alleged with malice or reckless indifference. Plaintiffs and the members of the classes and sub-classes they seek to represent are thus entitled to recover punitive damages in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

As to the First Claim for Relief:

a.    Certify the ERISA Class under Federal Rule of Civil Procedure 23; appoint Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the ERISA Class; and appoint their attorneys as Class Counsel to represent the members of the ERISA Class.

b.    Declare that the Severance Plan is an ERISA-governed Plan within the meaning of 29 U.S.C. § 1002(1).

c.    Declare that Defendants violated the terms of the Severance Plan by failing and refusing to pay benefits under the Plan to Plaintiffs and the ERISA Class.

d.    Order that Defendants pay severance benefits to Plaintiffs and the ERISA Class under the Severance Plan, , with interest;

e.    Surcharge Defendants in the amount of the 90% of health insurance premiums that

it was supposed to pay for Plaintiffs and the ERISA Class and their dependents;

f.       Award Plaintiffs attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

g.       Award such other and further relief as the Court deems equitable and just.

As to the Second Claim for Relief:

a.       Certify the ERISA Class under Federal Rule of Civil Procedure 23; appoint Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the ERISA Class; and appoint their attorneys as Class Counsel to represent the members of the ERISA Class.

b.       Declare that the Severance Plan is an ERISA-governed Plan within the meaning of 29 U.S.C. § 1002(1).

c.       Order Defendants to comply with ERISA with regard to the operation and administration of the Severance Plan in all regards; to cease violating requirements of ERISA that are applicable to the Plan; and to comply with the terms of the Plan insofar as consistent with ERISA.

d.       Impose equitable and remedial relief necessary to cure deficiencies created and/or caused by Defendants' non-compliance with ERISA, including but not limited to surcharge to make good any losses to Plaintiffs and the ERISA Class caused by any breaches of fiduciary duties, and disgorgement of any profits made by Defendants based on their non-compliance and breaches.

e.       Award Plaintiffs attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

f.       Award such other and further relief as the Court deems equitable and just.

As to the Third Claim for Relief:

a.       Certify the ERISA Class under Federal Rule of Civil Procedure 23; appoint

Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the ERISA Class; and

appoint their attorneys as Class Counsel to represent the members of the ERISA Class.

b.      Declare that the Severance Plan is an ERISA-governed Plan within the meaning of

29 U.S.C. § 1002(1).

c.      Award penalties for Emirates' failure to provide Summary Plan Descriptions to

Plan participants at the maximum amount of $110 a day for each such failure from the date of each

such failure, or in the amount that this Court determines to be equitable and just.

d.      Award Plaintiffs attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C.

§ 1132(g).

e.      Award such other and further relief as the Court deems equitable and just.

As to the Fourth Claim for Relief:

a.      Certify the NY WARN Act Class under Federal Rule of Civil Procedure 23; appoint

Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the NY WARN Act

Class; and appoint their attorneys as Class Counsel to represent the members of the NY WARN

Act Class.

b.      Declare that the practices complained of herein violate the NY WARN Act,

NYLL § 860 *et seq*.

c.      Award all damages permitted under the NY WARN Act.

d.      Award Plaintiffs reasonable attorneys' fees and costs.

e.      Award such other and further relief as the Court deems equitable and just.

As to the Fifth and Sixth Claims for Relief:

a.      Certify the Discrimination Class under Federal Rule of Civil Procedure 23; appoint

Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the Discrimination

Class; and appoint their attorneys as Class Counsel to represent the members of the Discrimination Class.

b.      Declare that the practices complained of herein violate Title VII, 42 U.S.C. §§ 2000e, *et seq.*

c.      Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs and the Discrimination Class because of their participation in this lawsuit.

d.      Order that Emirates institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of national origin and that it eradicate the effects of their past and present unlawful employment practices.

e.      Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

f.      Award Plaintiffs reasonable attorneys' fees and costs, as provided in Title VII, 42 U.S.C. Section 2000e-5(k), 42 U.S.C. Section 1981A, 42 U.S.C Section 1988.

g.      Award such other and further relief as the Court deems equitable and just.

As to the Seventh and Eighth Claims for Relief:

a.      Certify the NYS Discrimination Sub-Class under Federal Rule of Civil Procedure 23; appoint Plaintiffs Farah, Cammarata, Armstrong, and Simpson as representatives of the NYS Discrimination Sub-Class; and appoint their attorneys as Class Counsel to represent the members of the NYS Discrimination Sub-Class.

b.      Declare that the practices complained of herein violate NYSHRL, New York Executive Law § 296.

c.      Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or the NYS Discrimination Sub-Class because of their participation in this lawsuit.

d.      Order that Emirates institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of national origin and that it eradicate the effects of their past and present unlawful employment practices.

e.      Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

f.      Award Plaintiffs reasonable attorneys' fees and costs.

g.      Award such other and further relief as the Court deems equitable and just.

As to the Ninth and Tenth Claims for Relief:

a.      Certify the NYC Discrimination Sub-Class under Federal Rule of Civil Procedure 23; appoint Plaintiffs Farah, Armstrong, and Simpson as representatives of the NYC Discrimination Sub-Class; and appoint their attorneys as Class Counsel to represent the members of the NYC Discrimination Sub-Class.

b.      Declare that the practices complained of herein violate NYCHRL, Administrative Code of the City of New York § 8-107 *et seq.*

c.      Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs Farah, Armstrong, Simpson or the NYC Discrimination Sub-Class because of their participation in this lawsuit.

d.       Order that Emirates institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of national origin and that it eradicate the effects of their past and present unlawful employment practices.

e.       Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

f.       Award punitive damages to Plaintiffs Farah, Armstrong, and Simpson, and the NYC Discrimination Sub-Class.

g.       Award Plaintiffs Farah, Armstrong, and Simpson reasonable attorneys' fees and costs.

h.       Award such other and further relief as the Court deems equitable and just.

As to the Eleventh Claim for Relief:

a.       Declare that the practices complained of herein violate Title VII, 42 U.S.C. §§ 2000e, *et seq.*

b.       Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in retaliation against Plaintiffs because of their participation in this lawsuit.

c.       Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

d.       Award Plaintiffs reasonable attorneys' fees and costs, as provided in Title VII, 42 U.S.C. Section 2000e-5(k), 42 U.S.C. Section 1981A, 42 U.S.C Section 1988.

e.       Award such other and further relief as the Court deems equitable and just.

As to the Twelfth Claim for Relief:

a.      Declare that the practices complained of herein violate NYSHRL, New York Executive Law § 296.

b.      Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in retaliation against Plaintiffs because of their participation in this lawsuit.

c.      Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

d.      Award Plaintiffs reasonable attorneys' fees and costs.

e.      Award such other and further relief as the Court deems equitable and just.

As to the Thirteenth Claim for Relief:

a.      Declare that the practices complained of herein violate NYCHRL, Administrative Code of the City of New York § 8-107 *et seq.*

b.      Order a preliminary and permanent injunction against Emirates and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in retaliation against Plaintiffs Farah, Armstrong and Simpson because of their participation in this lawsuit.

c.      Award all damages sustained as a result of Emirates' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof.

d.      Award punitive damages to Plaintiffs Farah, Armstrong, and Simpson.

e.      Award Plaintiffs Farah, Armstrong, and Simpson for reasonable attorneys' fees and

costs.

   f.  Award such other and further relief as the Court deems equitable and just.


## JURY DEMAND


Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand a trial by jury in this action for all claims other than the ERISA claims.

PLAINTIFFS REQUEST TRIAL TO A JURY ON ALL CLAIMS ALLOWED BY LAW.


Dated: New York, New York
   October 12, 2021

                    */s/ Maya Risman*
                    Maya Risman, Esq.,
                    Risman & Risman, P.C.
                    299 Broadway, 17th Floor
                    New York, New York 10007
                    (212) 233-6400
                    mrisman@risman-law.com

                    Evan Brustein, Esq.
                    Brustein Law PLLC
                    299 Broadway, 17th Floor
                    New York, New York 10007
                    (212) 233-3900
                    evan@brusteinlaw.com

                    Kirsten Scott, Esq. (pro hac vice to be filed)
                    Teresa Renaker, Esq. (pro hac vice to be filed)
                    Renaker Hasselman Scott LLP
                    505 Montgomery Street, Suite 1125
                    San Francisco, CA 94111
                    (415) 653-1733
                    kirsten@renakerhasselman.com
                    teresa@renakerhasselman.com

                    *Counsel for Plaintiffs and the proposed classes*