UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAYENAT FARAH, JOSEPH CAMMARATA, CHARLOTTE ARMSTRONG, and VIOLET SIMPSON, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>                    -against-<br><br>EMIRATES and EMIRATES SEVERANCE PLAN,<br><br>                              Defendants. | 21-CV-05786-LTS |

<u>MEMORANDUM ORDER</u>

      Kayenat Farah, Joseph Cammarata, Charlotte Armstrong, and Violet Simpson (collectively, "Plaintiffs") bring this putative class action on behalf of all those similarly situated against Emirates Airlines ("Emirates") and Emirates Severance Plan ("the Plan") (together, "Defendants"), asserting claims predicated on alleged violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 <u>et seq.</u>, the New York State Worker Adjustment and Retraining Notification Act ("NY WARN"), N.Y. LAB. LAW § 860 <u>et seq.</u>, Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000 <u>et seq.</u>, the New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW § 296 <u>et seq.</u>, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. ADMIN. CODE § 8-107 <u>et seq.</u>  (Docket entry no. 38 (the "Amended Complaint" or "AC").)  The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

      The case is before the Court on Defendants' Motion to Dismiss counts 1-10 of the Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to

Federal Rule of Civil Procedure 12(b)(6),[1] as well as the Defendants' motion to strike Plaintiffs'

jury demand pursuant to Federal Rule of Civil Procedure 39(a)(2).  (Docket entry no. 42

("MTD").)  The Court has carefully considered the submissions of both parties and, for the

following reasons, Defendants' motions are denied in their entirety.

<u>BACKGROUND</u>

Unless otherwise indicated, the following allegations are taken from the Amended

Complaint, all well-pleaded factual content of which is presumed true for purposes of this

motion practice.[2]

Plaintiffs in this action are former employees of Emirates who were furloughed on

April 15, 2020, and later laid off during the summer of 2020.  (AC ¶¶ 17-20.)  Plaintiffs are each

United States citizens living in the State of New York.  (Id.)  Farah, Armstrong, and Simpson

(hereafter, the "City Employees") were three of approximately sixty employees working in

Emirates' New York office located at 55 East 59th St., New York, New York in March 2020.  (Id.

¶¶ 17, 19, 20.)  Cammarata was one of approximately forty-three total employees working at

Emirates' Call Center location in Nassau County, New York in March 2020.  (Id. ¶¶ 18, 99.)  On

or about April 15, 2020, Plaintiffs received a notice letter informing them that they were being

placed on unpaid furlough.  (Id. ¶ 77.)  The notice explained, <u>inter alia</u>, that furloughs were

---

[1]     Defendants do not move to dismiss counts 11-13 of the AC, which assert the Plaintiffs'
        individual retaliation claims under Title VII, NYSHRL, and NYCHRL, respectively.
        (<u>See</u> AC ¶¶ 265-80.)

[2]     The Court has also considered factual matter drawn from documents which are integral
        to, attached to, or incorporated by reference in the Amended Complaint.  <u>See</u> <u>DeLuca v.</u>
        <u>AccessIT Grp., Inc.</u>, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) ("[E]xtrinsic documents may
        be considered as part of the pleadings if they are (1) attached to the complaint; (2)
        incorporated into the complaint by reference; or (3) integral to the complaint.").

necessary because of COVID-19 and "its drastic impact on our industry."  (<u>Id.</u> ¶¶ 78-82; <u>see also</u>

docket entry no. 44-5 ("Furlough Letter").)  The notice stated that the furlough "may last several

months, and could last up to six months," that Emirates would keep the situation "constantly

under review," and that Emirates would notify furloughed employees of any changes.  (AC

¶¶ 80, 82.)  All Plaintiffs began their furlough in April 2020.  (<u>Id.</u> ¶ 77.)  While on furlough,

Plaintiffs were prohibited from performing any work for Emirates.  (<u>Id.</u> ¶ 118; Furlough Letter.)

Cammarata was notified that his employment was permanently terminated on

June 24, 2020.  (<u>Id.</u> ¶ 18; <u>see also</u> docket entry no. 44-6 ("Termination Letter").)  Emirates

terminated forty-two out of forty-three Call Center employees, including Cammarata, on or

around June 24, 2020.  (AC ¶¶ 99, 208, 209.)  On July 1, 2020, Emirates permanently terminated

fifteen employees from the City Office, including Farah, Armstrong and Simpson.  (<u>Id.</u> ¶¶ 17, 19,

20, 116.)  On or about October 2020, Emirates terminated an additional twenty-five employees

from the City Office.  (<u>Id.</u> ¶ 209.)

Following their terminations, each Plaintiff, through counsel, submitted a claim

for benefits under the Plan, and each was denied any severance payment.  (<u>Id.</u> ¶ 65.)  Cammarata

was separately informed by Jennifer Jackson, the Human Resources ("HR") Business Partner,

that "there is no severance payment with this redundancy."  (<u>Id.</u> ¶ 63.)  Plaintiffs plead, upon

information and belief, that Emirates had paid qualified terminated employees benefits under the

Plan in 2016 and prior years, including redundancy pay accrued per year of service as well as

three months of extended health insurance with employer premium contributions.  (<u>Id.</u> ¶ 50.)

Emirates maintained the Plan documents in its New York HR office and provided these

documents only to HR employees and managers, who were instructed to keep the information

confidential.  (<u>Id.</u> ¶¶ 34-37.)  Plaintiffs were not given access to any review procedures available

under the Plan.  (Id. ¶ 66.)  Emirates did not respond to Plaintiffs' October 19, 2020, requests for copies of the governing Plan documents.  (Id. ¶¶ 67-68.)

Plaintiffs further assert that, during their employment at Emirates, they were discriminated against on the basis of their national origin, specifically because they were or were perceived to be American, and that discrimination caused their ultimate termination.  (Id. ¶¶ 6-7.) Plaintiffs also allege that Emirates denied them severance and other benefits that were paid to similarly situated non-American employees and former employees (id. ¶ 148), and failed or refused to take reasonable steps to prevent and correct instances of discrimination against American employees (id. ¶¶ 146-48).  Plaintiffs allege that Emirates' head of Human Resources in the United States stated on multiple occasions that she preferred non-American workers (id. ¶ 132), and that the Call Center should be closed because it was staffed by American workers who "complained too much and felt entitled" (id. ¶¶ 52, 133).  According to Plaintiffs, Emirates also maintained a different wage scale for American workers, UAE nationals, and other non-American workers brought from overseas to work in the United States (id. ¶ 143), provided only non-American workers with travel benefits for one year or more following a termination of employment (id. ¶ 144), and otherwise maintained policies that favored hiring and promoting non-American nationals (id. ¶¶ 134, 145).

## DISCUSSION

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  In deciding a Rule 12(b)(6)

motion to dismiss, the Court must "draw all reasonable inferences in [p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013), certified question accepted sub nom. Thelen LLP v. Seyfarth Shaw LLP, 22 N.Y.3d 1017 (2013), and certified question answered, 24 N.Y.3d 16 (2014) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)).

*ERISA Claims*

Counts 1-3 of the Amended Complaint assert various causes of action under the ERISA premised on Defendants' denial of severance benefits to all Plaintiffs. Plaintiffs assert claims to recover benefits under the terms of the Plan, 29 U.S.C § 1132(a)(1)(B); for breach of the fiduciary duties of prudence and loyalty, id. § 1132(a)(3); and for Defendants' violation of statutory filing requirements and failure to furnish information to plan participants upon written request, id. § 1132(c)(1)(A). The threshold issue for all three ERISA claims is whether Plaintiffs plausibly allege the existence of an ERISA-governed "employee welfare benefit plan." See 29 U.S.C. § 1002(1), (2)(A). To determine whether a severance plan qualifies as an ERISA-governed plan, courts employ a three-factor test which considers: (1) "whether the employer's undertaking or obligation requires managerial discretion in its administration," (2) "whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits," and (3) "whether the employer was required to analyze the circumstances of

each employee's termination separately in light of certain criteria."  Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 76 (2d Cir. 1996) (internal quotations and citations omitted).  No single factor is determinative.  Id.

Plaintiffs assert that Emirates maintained an ERISA-governed severance plan, which provided benefits to employees who were found to qualify under set criteria.  (AC ¶¶ 3-4.)  The Plan provided a lump sum severance payment, calculated based on years of service, and a three-month extension of employer-provided health insurance with Emirates covering 90% of employee healthcare premiums.  (Id. ¶¶ 41-42, Ex. A.)  The Plan was administered by Emirates and funded by Emirates' operating assets.  (Id. ¶ 43.)  To determine if an employee was eligible, Emirates had to evaluate whether the employee's termination was for "just cause" or a change in business structure, and whether the employee complied with administrative and performance requirements during the notice period; each individual employee's benefits had to be evaluated and approved by the Senior Vice President ("SVP") of Human Resources and the SVP of Business under these considerations.  (Id. ¶ 44.)  The governing Plan terms were documented in the "US Pay and Allowance Manual," which was stored in a two-ring binder in the New York HR Office, as well as in electronic format.  (Id. ¶¶ 35-36.)  Copies of the Plan were provided to HR employees and managers, who were instructed to keep the Plan contents secret from other employees.  (Id. ¶¶ 37-38.)  Through her role in HR, Farah knew about and was trained to apply the Plan to each proposed termination.  (Id. ¶ 49.)  Employees terminated in 2016 received the benefits promised under the terms of the Plan.  (Id. ¶ 50.)

Applying these allegations to the Schonholz factors yields ambiguous results.  On the first factor, Defendants have argued persuasively that the calculation of benefits under the Plan constitutes "simple arithmetic" and not the sort of managerial discretion or administration

that supports the existence of an ERISA-governed plan.  See Taverna v. Credit Suisse First Boston (USA), Inc., No. 02-CV-5240-DC, 2003 WL 255250, at * 10 (S.D.N.Y. Feb. 4, 2003). Additionally, although the Plan provides for an extension of employer-contribution to healthcare premiums, the administrative burden of such benefits is minimal and likewise fails to provide compelling evidence of an ERISA plan.

To evaluate the second Schonholz factor, the Second Circuit has enumerated certain considerations to determine whether a reasonable employee would perceive an "ongoing commitment by the employer" to provide benefits.  Courts should consider, among other things, "(1) whether the plan is 'subject to termination or amendment' by the employer, [and] (2) whether the employer or the employee has ongoing responsibilities under the agreements." Kuhbier v. McCartney, Verrino & Rosenberry Vested Prod. Plan, 239 F. Supp. 3d 710, 731 (S.D.N.Y. 2017) (internal citations omitted).  First, the purported US Pay and Allowance Manual excerpt that is annexed to the Complaint does not address the terminability of the Plan.  Plaintiffs have plead that they lack access to information regarding the terms of the Plan because of the Defendants' purposeful concealment of Plan documents during Plaintiff's employment and their refusal to furnish those documents to counsel upon request.  (AC ¶¶ 38, 67.)

Plaintiffs have also alleged that Emirates has demonstrated an ongoing commitment to providing the Plan's benefits to employees over many years.  Cf. James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 468 (2d Cir. 1993) (finding no ERISA-governed plan, in part, because the promised severance payments were to be disbursed in a single, lump sum amount conditioned on a single event occurring at a definite time in the near future).  Emirates employees terminated in 2016 received benefits under the Plan, and HR employees and managers were informed of the Plan and were trained to apply the Plan consistently to new

terminations.  (AC ¶¶ 48-51.)  Defendants unpersuasively argue that a "reasonable employee" would not have expected to benefit from the Plan because the terms of the Plan were not disseminated.  (Def. Mem. at 17 (citing Hayles v. Adv. Travel Mgmt. Corp., No. 01-CV-10017-BSJ-DFE, 2004 WL 26548, at *8 (S.D.N.Y. Jan. 5, 2004) (finding, on a motion for summary judgment, no ERISA-governed plan, in part, because the alleged Plan was unwritten and, accordingly, there was no showing that the employer "published or publicized any policy indicating that it normally pays out severance benefits")).)  Unlike in Hayles, Plaintiffs allege that Emirates maintained a written Severance Policy (AC ¶¶ 32-36), disseminated the written policy to HR employees and managers (id. ¶ 37), and trained HR employees to apply the Plan to terminated employees (id. ¶ 49).  Read in the light most favorable to their claim, these allegations weigh in favor of finding that a reasonable employee would have perceived a commitment on Emirates' behalf to providing benefits.

However, actual benefits provided under the Plan — the lump sum payment and short extension of health insurance premium contributions — are not the sort of "ongoing commitment" to post-employment engagement that weighs in favor of an ERISA-governed plan. See Sheer v. Israel Discount Bank of N.Y., No. 06-CV-4995-PAC, 2007 WL 700822, at *2 (S.D.N.Y. Mar. 7, 2007) (finding no "ongoing commitment" where neither the employer nor the employee had ongoing responsibilities after the "employee receives her severance payment and leaves the company"); cf. Tischman v. ITT/Sheraton Corp., 145 F.3d 561, 567 (2d Cir. 1998) (finding an ERISA-governed plan, in part, due to the employee's ongoing responsibility, even after termination, to "be available" to render services to the company under "reasonable circumstances").  Therefore, the structure of the benefit payments does not weigh clearly for or

against a determination that the Plan is an ERISA-governed plan, and the second <u>Schonholz</u> factor yields ambiguous results.

       The final <u>Schonholz</u> factor asks whether the employer had to evaluate each employee individually to determine who qualified for benefits under the Plan.  Plaintiffs allege that Emirates had to evaluate whether employees were terminated for cause, whether the employee continued to perform satisfactorily during the notice period, and whether the employee met certain administrative requirements, such as signing necessary forms.  (AC ¶¶ 39-40, 44.)  All benefits for each individual employee had to be "evaluated and approved" by Emirates' SVP of HR and the SVP of Business.  (<u>Id.</u> ¶ 44.)  While these determinations do require the exercise of some discretion, courts have not always found these determinations to be "the type of managerial discretion contemplated by ERISA."  <u>Sheer</u>, 2007 WL 700822, at *3; <u>compare</u> <u>Okun v. Montefiore Med. Ctr.</u>, 793 F.3d 277, 280 (2d Cir. 2015) (finding a plan required "discretion and individualized evaluation to administer" where the employer had to determine if termination was voluntary or for cause, and there could be a discretionary review of the amount owed to senior employees), <u>and</u> <u>Simas v. Quaker Fabric Corp. of Fall River</u>, 6 F.3d 849, 853 (1st Cir. 1993) ("The 'for cause' determination, in particular, is likely to provoke controversy and call for judgments based on information well beyond the employee's date of hiring and termination."), <u>with</u> <u>Taverna</u>, 2003 WL 255250, at *3 (finding no ERISA plan where the employer had to exercise "minimal quantum of discretion" to determine if employees had to continue satisfactory job performance between notice and termination).  Once again, this factor yields ambiguous results.

       Viewing the allegations and drawing all reasonable inferences in favor of the Plaintiffs — and accounting for the limited information available to them without the benefit of

discovery — the Court concludes that the allegations could support an inference that the Severance Plan was an ERISA-governed plan.  Therefore, the Court finds that Plaintiffs have adequately plead claims for relief under ERISA for denial of benefits, breach of fiduciary duty, and failure to furnish plan information upon written request.  Defendants' motion to dismiss counts 1-3 of the Amended Complaint is, accordingly, denied.

### *Discrimination Claims*

Counts 5-10 of the Amended Complaint assert employment discrimination claims for both intentional discrimination and disparate impact discrimination under Title VII, NYSHRL, and NYCHRL, respectively.

#### Intentional Discrimination

Intentional discrimination claims brought under Title VII are subject to the McDonnell-Douglas burden shifting framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973).  The NYCHRL imposes a more liberal pleading standard; Plaintiffs are only required to plead sufficient information to show they have a "plausible case" for discrimination. Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75 (2d Cir. 2015).  Intentional discrimination claims accrued prior to the August 12, 2019, amendment of the NYSHRL should be analyzed under the same standard as claims brought under Title VII.  Tolbert v. Smith, 730 F.3d 427, 438-39 (2d Cir. 2015).  NYSHRL discrimination claims accrued after August 12, 2019, must be construed "liberally for the accomplishment of the remedial purpose of [the law]" and should now be interpreted as "rendering a standard for claims closer to the standard of the NYCHRL." Cooper v. Franklin Templeton Invs., No. 22-2763-CV, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (citing N.Y. Exec. Law § 300); see also Baptiste v. City Univ. of N.Y., No. 22-CV-2785-

JMF, 2023 WL 4266914, at *3 n.1 (S.D.N.Y. June 29, 2023).  Given that Title VII has stricter pleading requirements than either the State or City laws, if Plaintiffs adequately state a claim under Title VII, they necessarily state a claim under both NYSHRL and NYCHRL.

To plead a prima facie case of intentional discrimination under Title VII, Plaintiffs must plausibly allege: (1) they are members of a protected class, (2) they were qualified for the position held, (3) they suffered an adverse employment action, and (4) that adverse action occurred under circumstances giving rise to an inference of discrimination.  Brown v. Daikin Am. Inc., 756 F.3d 219, 229 (2d Cir. 2014) (citing Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001)).  Plaintiffs allege that they are a protected class because their national origin is American.  (AC ¶ 6; see also Goyette v. DCA Advert., Inc., 828 F. Supp. 227, 232-33 (S.D.N.Y. 1993) ("There is no dispute that the plaintiffs, as person of American national origin, benefit from the protection of Title VII.").)  Next, Plaintiffs allege that they were well-qualified for their respective positions, in which each had worked for several years before termination and for which their performance was regularly deemed satisfactory.  (AC ¶¶ 125, 138.)  Plaintiffs have also alleged that they suffered various adverse employment actions including the denial of benefits (id. ¶ 222), lower pay (id.), and ultimately, termination (id. ¶ 135).

Finally, Plaintiffs have alleged facts sufficient to find that these actions occurred under circumstances giving rise to an inference of impermissible discriminatory motivation.  See Littlejohn v. City of N.Y., 795 F.3d 297, 310-11 (2d Cir. 2015) ("[A]t the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent. . . . [She need only satisfy] a minimal burden of showing facts suggesting an inference of discriminatory motivation[.]" (emphasis in original)).  Plaintiffs allege, inter alia, that one high-ranking Emirates employee

stated that she preferred non-American workers and that the Call Center — which was
effectively closed in June 2020 — should be closed because American workers complained too
much and felt entitled.  (AC ¶¶ 132-33.)  They also allege that Emirates did not terminate and
refuse severance benefits to any non-American workers in the United States during the pandemic
layoffs, yet all American workers fired during that time were denied those benefits.  (Id. ¶¶ 139-
41.)  Emirates also allegedly provided non-American workers travel benefits that were not
offered to American workers, and "at nearly all levels" paid American workers lower salaries
than non-American workers in the United States.  (Id. ¶¶ 143-45.)  These allegations satisfy
Plaintiffs' minimal burden at the pleading stage.  Littlejohn, 795 F.3d at 308-309.

      Defendants argue that Plaintiffs have failed to state an intentional discrimination
claim under Title VII or NYSHRL because any discriminatory acts alleged were based on
Plaintiffs' American citizenship rather than their national origin, and citizenship is not a
protected category under Title VII or NYSHRL for claims brought during the relevant period.[3]
(Def. Mem. at 19; see also Espinoza v. Farah Mfg. Co., 414 U.S. 86, 95 (1973) ("[N]othing in
the Act makes it illegal to discriminate on the basis of citizenship or alienage.").)  Plaintiffs have
adequately alleged discriminatory comments attributing negative characteristics to "Americans"
and treatment that — when read in the light most favorable to their claim — plausibly suggest
discrimination on the basis of their American origin.  See Goyette, 828 F. Supp. at 234-35
(finding, on a motion for summary judgment, sufficient evidence to support an inference of
national origin discrimination, which included managers' statements disparaging American
workers and favoring Japanese workers as well as the denial of benefits to American workers).

---

[3]     Defendants concede that citizenship is a protected category for claims brought under the
NYCHRL during the relevant period.  (Def. Mem. at 19.)

To the extent that Defendants contend the discrimination was rooted in Plaintiffs' citizenship, Plaintiffs are entitled to the opportunity to respond to that explanation, and to show that it may be pretextual, at later stages in litigation.  Littlejohn, 795 F.3d at 307.  Any determinations on the validity of Plaintiffs' prima facie case based on Defendants' nondiscriminatory explanation would be premature at this stage.

Therefore, the Court finds Plaintiffs have adequately stated a claim for intentional discrimination under Title VII, and thus also state a claim under the more lenient standards of NYSHRL, and NYCHRL with respect to the City Office employees.  Defendants' motion to dismiss counts 5, 7 and 9 of the Amended Complaint is accordingly denied.

Disparate Impact

A prima facie case for disparate impact discrimination under Title VII must: "(1) identify the specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two."  Mandala v. NTT Data, Inc., 975 F.3d 202, 207-208 (2d Cir. 2020) (citation omitted).  Disparate impact discrimination does not require a Plaintiff to show that Defendants had the intent to discriminate against the impacted group.  Id. For NYCHRL claims, and NYSHRL accrued after August 12, 2019, Plaintiffs' prima facie case consists of the same three requirements, but the claims are to be "construed more liberally than their counterparts under Title VII and the previous version of the NYSHRL."  Syeed v. Bloomberg L.P., No. 20-CV-7464-GHW, 2022 WL 3447987, at *11 (S.D.N.Y. Aug. 17, 2022) (internal quotations and citations omitted).  Again, if Plaintiffs state a claim under Title VII, they also state a claim under the more liberal pleading standards of NYSHRL and NYCHRL.

Plaintiffs allege that Emirates instituted "company-wide policies, patterns and/or practices determining compensation and eligibility for promotion based on national origin[.]"

(AC ¶ 229.)  They allege that Emirates instituted different wage scales for American and non-American workers and "at nearly all levels" paid Americans less well than non-Americans.  (Id. ¶ 145.)  Emirates also purportedly maintained policies that favored hiring of non-American workers over American workers and, since 2016, has been "replacing American workers in upper management positions in the United States with United Arab Emirates nationals or other non-American workers."  (Id. ¶¶ 134, 146.)  As a direct result of these discriminatory policies and practices, Plaintiffs have suffered damages including lost income, compensation, and benefits.  (Id. ¶¶ 230, 247, 263.)  These allegations satisfy Plaintiffs' burden at the pleading stage.  See Jenkins v. N.Y.C. Trans. Auth., 646 F. Supp. 2d 464, 469-70 (S.D.N.Y. 2009) (finding, at the pleading stage for a disparate impact claim, a plaintiff need not provide statistical evidence of discrimination but must identify a specific employment practice to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002))).

The Court finds that Plaintiffs have adequately plead a claim for relief for disparate impact discrimination under Title VII, NYSHRL and, with respect to the City Office employees, NYCHRL.  Defendants' counterarguments that they did not, in fact, maintain the alleged policies are premature at this stage.  (See Def. Mem. at 23-24.)  Therefore, Defendants' motion to dismiss counts 6, 8, and 10 of the Amended Complaint is denied.

*NY WARN Claim*

The NY WARN Act provides that "[a]n employer who fails to give notice as required by [the Act] before ordering a mass layoff, relocation, or employment loss is liable to an employee entitled to receive notice who lost his or her employment."  N.Y. LAB. LAW § 860-g.

To state a claim for relief under NY WARN, Plaintiffs must allege facts showing, within the meaning of the statute, that: (1) Defendant is an "employer," (2) Plaintiffs are "affected employees," (3) a "mass layoff" occurred, and (4) Defendant failed to give ninety-days' notice. See N.Y.'s Health & Hum. Serv. Emps. Union 1199/SEIU, AFL-CIO v. Grossman, No. 02-CV-6031-SLT-JMA, 2007 WL 2907386, at *18-19 (E.D.N.Y. Oct. 3, 2007).  Defendants do not dispute that Emirates is an "employer" and Plaintiffs are "affected employees" within the meaning of the NY WARN Act.  (See Def. Mem.)  Defendants dispute, however, whether the factual allegations of the Complaint plausibly establish that the terminations of the City Office employees were a "mass layoff," and whether Emirates gave sufficient notice under the circumstances.  (Id. at 8-15.)

Mass Layoff

A "mass layoff" is defined as a reduction in a workforce which "(1) is not the result of a plant closing; and (2) results in an employment loss at a single site of employment during any 30-day period, beginning on the date of the first employment lost, for either: [a]t least twenty-five (25) employees constituting at least 33% of the employees at the site, OR at least 250 employees."  N.Y. Lab. Law § 860-a(4); see also N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 12 § 921-6.3(f).  An "employment loss" is defined, in relevant part, as a termination, "other than a discharge for cause, voluntary departure, or retirement," or "a mass layoff exceeding six months."  N.Y. Lab. Law § 860-a(2)(a)-(b).  A temporary furlough is considered a "short-term layoff" if it lasts fewer than six months but is considered an "employment loss" if it exceeds six months.  Id. § 860-d.  If an initially short-term furlough is later extended beyond six months for any reason other than business circumstances "not

reasonably foreseeable at the time of the initial layoff,"[4] the "date of layoff," for the purposes of

the statute, is considered to be the date the furlough originally commenced.  N.Y.C.R.R. tit. 12

§ 921.3.1; see also id. § 921-1.1(c) ("Date of layoff means the last day an employee is eligible or

permitted to work for his/her employer.").

Plaintiffs have alleged that all named Plaintiffs and proposed class members were

furloughed from either the City Office or the Call Center on or around April 15, 2020, and that

none of the furloughed employees received pay or was permitted to work for Emirates thereafter.

(AC ¶ 210.)  For each employee, the temporary furloughs were extended into a permanent layoff

at various times over the following months; fifteen City Office employees were permanently

terminated on or around July 1, 2020 (id. ¶ 209), and twenty-five City Office employees were

permanently terminated in October 2020 (id.).  Still, the "date of layoff" for all forty employees

in the City Office must be considered the last day they were permitted to work for Emirates —

the day the furlough commenced — in April 2020.  (Id. ¶ 210.)  Plaintiffs have alleged that the

City Office employed approximately sixty-five people at that time.  (Id. ¶ 116.)  Therefore, the

April 2020 furlough of forty City Office employees constituted a reduction in workforce of over

33% of the employees at the site, qualifying the event as a "mass layoff."  N.Y. Lab. Law § 860-

a(4).  Additionally, the April 2020 furlough of forty-two of the forty-three employees at the Call

---

[4]     Defendants argue that the terminations were a result of the COVID-19 pandemic (Def. Mem. at 8-14), which constituted an "unforeseeable business circumstance" that was "not reasonably foreseeable" at the time of the April 2020 furloughs.  N.Y.C.R.R. tit. 12 § 921-3.1.  As discussed infra, Plaintiffs have alleged facts that, when viewed in the light most favorable to their claim, plausibly support an inference that the ongoing effects of the pandemic were "reasonably foreseeable" at the time of the April 2020 furloughs.  (See AC ¶¶ 71-73, 110-14.)  Because a final determination regarding whether Emirates can avail itself of the "unforeseeable business circumstances" defense is premature at this stage, and the Court is bound to draw all reasonable inferences in favor of the Plaintiffs, section 921-3.1 requires recognition of the mass layoff as beginning the day the first furlough commenced.

Center, which was made permanent by the June 24, 2020, terminations, also satisfies the definition of a "mass layoff" under the statute.  Id.  Therefore, the Court finds that Plaintiffs have plausibly alleged that both the City Office and the Call Center layoffs were "mass layoffs" requiring ninety days' notice under the NY WARN Act.[5]

> ### Notice and Exceptions

Defendants next argue that they did not violate the notice requirements of the NY WARN Act because the unprecedented effects of the COVID-19 pandemic qualify for the "unforeseeable business circumstances" and "natural disaster" exceptions to the notice requirement.  (Def. Mem. at 8-14.)  At the outset, the Court may only dismiss a claim based on an affirmative defense presented on a 12(b)(6) motion if the grounds for dismissal are evident on the face of the claim itself.  Jones v. Block, 549 U.S. 199, 215 (2007).  Plaintiffs are "not required to allege in the [Complaint] all circumstances necessary to negate [any] affirmative defense[s]."  In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 318 (S.D.N.Y. 2011).  Therefore, the central question for the Court's consideration at this stage is whether or not Defendants' notice requirement defenses "appear[] on the face of the complaint."  Ellul v. Congregation of Christian Bros., 774 F.3d 791, 789 n.12 (2d Cir. 2014).

Plaintiffs allege that they were furloughed in April 2020, shortly after international travel restrictions greatly impacted the airline industry.  (AC ¶¶ 103-104.) Emirates' furlough letter and eventual notices of termination both stated that the workforce

---

[5]    Because Plaintiffs have sufficiently alleged that the layoffs at the Call Center and the City Office both qualified as "mass layoffs" under NY WARN, the Court need not consider at this time whether the offices ought to be considered a "single site" of employment for the purposes of aggregating employment losses under the statute.  (See Def. Mem. at 14-15; Pl. Mem. at 17-18; see also N.Y. LAB. LAW § 860-a(p)(iii) (describing the relevant considerations to determine whether separate buildings or facilities may be considered a "single site of employment").)

reduction was necessary to weather the "unprecedented" effects of the pandemic and the resulting economic environment.  (Furlough Letter; docket entry no. 44-6 ("Termination Notice").)  The furlough letter itself provided deficient notice under NY WARN — Emirates did not fulfill the Act's specific notice requirements until they sent the final termination letter, which informed Plaintiffs of their immediate employment loss.[6]  (AC ¶¶ 102-105; see also N.Y. LAB. LAW § 860-b; N.Y.C.R.R. tit. 12 § 921-2.3.)  Notice was not given until each Plaintiff received their termination notice, in which Emirates wrote, "We apologize that we were unable to provide you more advance notice of this [termination], but we were unable to do so."  (AC ¶ 102; Termination Notice.)  The letter also asserted that, "the sustained nature of governmental travel restrictions due to COVID-19 was not foreseeable."  (Id.)

        An employer may be exempt from the full ninety-day notice requirement if "the need for a notice was not reasonably foreseeable at the time the notice would have been required," or "the . . . mass layoff is due to any form of natural disaster, such as a flood, earthquake, or drought."  N.Y. LAB. LAW § 860-c(1)(b), (d).  In order to qualify for the "unforeseeable business circumstances" exception, Emirates must establish the layoffs were caused by "the occurrence of some sudden, dramatic, and unexpected action or condition outside of the employer's control."  N.Y.C.R.R. tit. 12 § 921-6.3.  The natural disaster exception requires that the layoff was a "direct result of any form of a natural disaster including floods, earthquakes,

---

[6]     Defendants assert that they gave "effective notice" over sixty days before the first termination, via the furlough letters that put employees on immediate unpaid furlough. (Docket entry no. 47 ("Def. Reply")) at 6-7.)  This argument is unpersuasive.  At a minimum, under NY WARN, "notice must be specific" and must meet certain enumerated requirements, such as providing information regarding each employee's bumping rights, job training, and re-employment services.  N.Y.C.R.R. tit. 12 § 921-2.1, 2.3.  The furlough letter failed to meet NY WARN's strict notice requirements.

droughts, storms, tidal waves, tsunamis, and or similar effects of nature." <u>Id.</u> § 921-6.4.  The

employer "bears the burden of proof to show that the requirements for an exception have been

met." <u>Id.</u> § 921-6.1.  Additionally, even under these exceptions, "the employer must provide as

much notice as possible in advance of the . . . mass layoff . . . to all required parties and also

include a statement of the reason for reducing the notice period." <u>Id.</u> § 921-6.1.  If an employer

must extend temporary furloughs into permanent layoffs due to "business circumstances . . . not

reasonably foreseeable at the time of the initial layoff," the employer is required to give notice

"as soon as it becomes foreseeable that an extension is required." <u>Id.</u> § 921-31.

        Plaintiffs assert that Defendants are not entitled to a notice exception because the

mass layoffs were neither "unforeseeable" nor a "direct result" of the pandemic.[7]  (AC ¶ 109.)

Rather, they allege, Emirates could have complied with the Act's notice requirements, because it

knew about the impending layoffs, and chose not to provide any notice whatsoever.  (<u>Id.</u> ¶¶ 110-

14.)  Plaintiffs allege Emirates had advanced warning of the pandemic's effects because global

health and travel advisories began on January 31, 2020, and the United States instituted travel

bans on March 13, 2020, one month before the furloughs began.  (<u>Id.</u> ¶¶ 71-73.)  These

allegations, read in the light most favorable to Plaintiffs, plausibly support an inference that

Defendants failed to give "as much notice as possible," even if Emirates can satisfy its burden of

---

[7]    Plaintiffs also dispute Defendants' contention that the COVID-19 pandemic qualifies as a "natural disaster" under the statute.  The Second Circuit has not yet decided this issue in the context of NY WARN.  Courts outside of this Circuit have found that the pandemic is not the sort of "natural disaster" contemplated under the federal WARN Act because, like NY WARN, Congress chose not to include "terms like disease, pandemic or virus in the statutory language of the WARN Act." <u>See</u> <u>Easom v. U.S. Well Servs., Inc.</u>, 37 F.4th 238, 244 (5th Cir. 2022), <u>cert denied</u> 143 S.Ct. 427 (Nov. 14, 2022).  In other statutory and legal contexts, courts within this district have found that COVID-19 qualifies as a "natural disaster." <u>See, e.g.</u>, <u>JN Contemp. Art LLC v. Phillips Auctioneers LLC</u>, 507 F. Supp. 3d 490, 501 n.7 (S.D.N.Y. 2020).  In any event, the Court need not — and does not — decide this issue at this stage.

establishing entitlement to either notice exception.  Therefore, the Court finds on the face of the

Complaint that the pleadings are sufficient to support an inference that Emirates was required to

give terminated employees notice and the notice given was insufficient.

Because any determinations regarding the Defendants' affirmative defenses are

inappropriate at this stage and Plaintiffs have adequately plead their prima facie case,

Defendants' motion to dismiss count four of the Amended Complaint is denied.


*Motion to Strike the Jury Demand*

Defendants move to strike the Plaintiffs' jury demand, pursuant to Rule 39(a)(2)

of the Federal Rules of Civil Procedure, on the basis that the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. § 1602 et seq., prohibits jury trials of claims against instrumentalities of a

foreign sovereign.  (MTD; Def. Mem. at 24-25.)  "The district courts shall have original

jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign

state as defined in section 1603(a) of this title as to any claim for relief in personam with respect

to which the foreign state is not entitled to immunity . . . ."  28 U.S.C.A. § 1330(a) (Westlaw

through P.L. 118-41).  The FSIA defines when a party is entitled to immunity as a foreign state,

and under what circumstances federal courts may exercise jurisdiction of foreign states.  See 28

U.S.C. § 1603(a).  The parties do not dispute that Emirates, even if entitled to the protection of

the FSIA, is not immune to any of the Plaintiffs' claims.  However, the FSIA only provides for

nonjury civil trials against foreign states.  See 28 U.S.C. § 1330.  Therefore, if Emirates is a

"foreign state" within the meaning of section 1603, Plaintiffs will not be entitled to a jury trial on

any of their civil claims.  See Bailey v. Grand Trunk Lines New Eng., 805 F.2d 1097, 1101 (2d

Cir. 1986) (finding the Defendant immune from jury trials even though it "waived its immunity

from suit in the United States by virtue [sic.] of its commercial activities [because] it remains amenable to suit in our courts only to the extent permitted by, and in accordance with the express terms of, the FSIA.").

To invoke the FSIA, Defendants must produce prima facie evidence that they are entitled to sovereign immunity. Plaintiffs then bear the burden of showing that, under the exceptions set forth in the FSIA, immunity should not be granted. The ultimate burden of persuasion remains with Emirates as the party asserting immunity. Marchisella v. Gov't of Japan, No. 02-CV-10023-DC, 2004 WL 307248, at *2-3 (S.D.N.Y. Feb. 17, 2004); see also Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 (2d Cir. 2001).

Under 28 U.S.C. section 1603(b), an "agency or instrumentality of a foreign state" is — in relevant part —any entity (1) "which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof." 28 U.S.C.A. § 1603(b)(1)-(2) (Westlaw through P.L. 118-41). Emirates has proffered evidence that it is owned by the Investment Corporation of Dubai ("ICD"), which is a sovereign wealth fund wholly owned and controlled by the Government of Dubai. (Def. Mem. at 24; see also docket entry no. 44-1 (the "Annual Report").) Critically, Emirates is not itself owned by "a foreign state or a political subdivision thereof," but is instead owned by an intermediary corporation — the ICD — which is, in turn, controlled by the Government of Dubai. (Def. Mem. at 24.) Yet, the FSIA only provides immunity for instrumentalities which are directly owned by a foreign state; the "tiering" of instrumentalities and subsidiaries is not permissible under the FSIA. See Dole Food Co v. Patrickson, 538 U.S. 468, 473-74 (2003) (holding that "indirect subsidiaries" of foreign governments do not satisfy the FSIA because "only direct

ownership of a majority of shares by the foreign state satisfies the statutory requirement"); see also Chavez v. Occidental Chem. Corp., 8 F.4th 91, 95 (2d Cir. 2021).  Thus, the Court cannot find Emirates to be an instrumentality of Dubai on the basis of the government's ownership of ICD.

    While indirect state ownership does not satisfy the "instrumentality" definition of section 1603, Emirates may still be a "foreign state" within the meaning of the statute if it is an "organ of a foreign state or a political subdivision thereof."  28 U.S.C.A. § 1603(b)(2) (Westlaw through P.L. 118-41); see also European Comm. v. RJR Nabisco, Inc., 764 F.3d 129, 144 (2d Cir. 2014), rev'd on other grounds, 579 U.S. 325 (2016).  Because Congress did not define what constitutes an "organ of a foreign state" under the FSIA, courts have developed a five-factor test to determine whether a party meets the definition.  See RJR Nabisco, 764 F.3d at 144 (citing Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004)).  Courts consider: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.  Id.  No single factor is determinative, and the analysis requires a balancing process.  Id.

    On the current record, Emirates has proffered insufficient information to permit the Court to engage in a determination as to whether it is an "organ" of Dubai.  (See Def. Mem. at 24-25.)  Therefore, the Court finds that it lacks the necessary information to determine Emirates' status under the FSIA.  Because Defendants have failed to establish a prima facie case for immunity at this time, their motion to strike the jury demand is denied without prejudice to renewal at a later date.

<u>Conclusion</u>

For the foregoing reasons, the Defendants' motion to dismiss is denied in its entirely.  The Defendants' motion to strike the jury demand is denied without prejudice to renewal.  Defendants are hereby directed to file an answer to the Amended Complaint by **April 22, 2024.**  This case will be referred to Magistrate Judge Netburn for general pretrial management.

This Memorandum Order resolves docket entry no. 42.

SO ORDERED.

Dated: New York, New York
       March 31, 2024

                                                   /s/ Laura Taylor Swain
                                                   LAURA TAYLOR SWAIN
                                                   Chief United States District Judge